1997-NMCA-120

949 P.2d 1193

**Christine GABALDON, individually and as next friend of her minor children Victor Baldizan and Charlene Baldizan, Plaintiffs–Appellants.**

v.

**ERISA MORTGAGE COMPANY, Jointly and Severally, Defendant–Appellee.**

No. 17038.

Court of Appeals of New Mexico.

Oct. 17, 1997.

Certiorari Granted Nov. 21, 1997.

Albert B. Lassen, Lassen & Jaffe, Albuquerque, for Plaintiffs–Appellants.

J.E. Casados, Robert L. Hlady, Gallagher, Casados & Mann, P.C., Albuquerque, for Defendant–Appellee.

## OPINION

BUSTAMANTE, Judge.

1. Young Victor Baldizan was injured in a near-drowning incident in the wave machine

at The Beach Waterpark (The Beach) in Albuquerque. Victor, acting by and through his mother, filed suit against the owner of the property, Erisa Mortgage Company (Erisa), the lessee/operator of the property, Jay–Bi Property Management, Inc., and the City of Albuquerque. Victor appeals from an order dismissing his claims against Erisa, asserting that (1) operation of a wave pool is an inherently dangerous activity, thus imposing a non-delegable duty on the owner of the property for the safety of waterpark patrons; and (2) Erisa negligently entrusted operation of the park to Jay–Bi. We hold that operation of a wave pool is not an inherently dangerous activity and that there are questions of fact precluding summary judgment on Victor's negligent entrustment theory. We therefore reverse in part and affirm in part.

*INHERENTLY DANGEROUS ACTIVITY*

2. The procedural posture of this case requires us to explore two preliminary considerations before we deal with the core substantive issue. First, we must identify the substantive issues we will address. Second, we examine and define the standard of review we should apply. The latter discussion is necessary because of the potential conflict between the normal standards we use in summary judgment cases and the standard applied when we are dealing with questions of law. *See Sarracino v. Martinez,* 117 N.M. 193, 194–95, 870 P.2d 155, 156–57 (Ct.App. 1994).

3. Plaintiff's theory of inherently dangerous activity presents two distinct questions of law: (1) whether wave pools are inherently dangerous, and (2) whether the principle of non-delegable duty flowing from a determination of inherently dangerous activity applies to impose potential liability on a non-possessory landlord. The first is the narrower issue, and, in keeping with our general desire to decide cases on narrow rather than broad grounds, we address it first. Because our decision on the first issue resolves this case, the second issue remains unanswered.

*STANDARD OF REVIEW*

4. Whether an activity should be deemed inherently dangerous—thus imposing a non-delegable duty of care on the person on whose behest the activity is undertak-

en—is a question of law. *Saiz v. Belen Sch. Dist.,* 113 N.M. 387, 395–96, 398, 827 P.2d 102, 110–11, 113 (1992). We, of course, accept this proposition, but we harbor some concern about its application on appeal from a grant of summary judgment. While characterization of an activity as inherently dangerous is the responsibility of the courts, the determination can rarely be made in the absence of facts concerning the nature of the danger posed by the activity. While some activities may be deemed inherently dangerous simply as a matter of common experience (for example, as in *Saiz,* 113 N.M. at 398, 827 P.2d at 113, construction and maintenance of high voltage lines in areas where the general public is likely to come in contact with them), it is likely that in most instances the court will need a factual record underpinning its decision. The party seeking determination of an inherently dangerous activity bears the burden of making an adequate factual showing. The adequacy of the showing is to be assessed by the court, not by the jury. *Id.* at 396, 827 P.2d at 111. Thus, even in a case in which a jury has been demanded, the ultimate decision on this issue is made by the court.

5. The procedural tool used by the trial court to make its decision has the potential to complicate review on appeal, and this case is a good example of that potential coming to fruition. The trial court dismissed the claim against Erisa, and decided the legal issue of inherently dangerous activity, in response to Erisa's "Motion To Dismiss Or In The Alternative for Summary Judgment." Since both parties submitted affidavits, exhibits and other material outside the pleadings, the matter was properly treated as a motion for summary judgment. Normally, when reviewing a grant of summary judgment, appellate courts view the evidence in the light most favorable to the party opposing the motion, that is, in support of the right to a trial on the merits. *Sarracino,* 117 N.M. at 194, 870 P.2d at 156. When there is conflicting evidence, or the evidence supports conflicting inferences, summary judgment is improper. *Id.* The final requirement of the review rubric is that summary judgment

should be granted only "when a party is entitled to judgment as a matter of law." *Id.*

■ 6. A different standard is applied when reviewing a trial court decision on a question of law. In that instance the appellate court reviews the legal issues on a de novo basis. That is, the appellate court decides the legal issue with no formal deference paid to the trial court decision. *See State v. Attaway*, 117 N.M. 141, 144–45, 870 P.2d 103, 106–07 (1994); *Ledbetter v. Webb*, 103 N.M. 597, 602–03, 711 P.2d 874, 879–80, (1985) ("An appellate court is not bound by a trial court's erroneous conclusion of law.").

■ 7. When the decision presents a mixed question of fact and law, review is altered to the extent that the appellate court should defer to the trial court's findings as to the "historical facts that animate the transaction to be evaluated" to the extent they are supported by substantial evidence in the record. *Attaway*, 117 N.M. at 144, 870 P.2d at 106. However, the legal consequences flowing from the historical facts will be subject to de novo review if the question involves matters of public policy with broad precedential value beyond the confines of the particular case. *Id.* at 144–45, 870 P.2d at 106–07. This judgment has already been made in this arena by our Supreme Court in *Saiz*, 113 N.M. at 398, 827 P.2d at 113. Thus, we review the question of inherently dangerous activity de novo.

8. However, we are still faced with a question of which standard we should apply to the historical or underlying facts which were presented to the trial court and upon which it presumably based its decision. Should the summary judgment standard resolving all reasonable inferences in favor of trial be applied? Or, should we apply a standard more akin to an independent review of the record? The answer depends on whether there are factual issues which can reasonably be submitted to the jury. In *Sarracino*, 117 N.M. at 194, 870 P.2d at 156, for example, we reversed a summary judgment which had been "based in part on a determination that Defendant did not owe a duty to Plaintiff." In *Sarracino*, the plaintiff

was attacked by a third person while waiting in defendant's automobile to be taken home. There was evidence plaintiff was intoxicated to the extent she could not take care of herself. Defendant apparently asserted the general rule that " 'absent a showing that a party has a special relationship with another, the party has no duty to protect the other from harm caused by criminal acts of third persons.' " *Id.* at 195, 870 P.2d at 157 (quoting *Rummel v. Edgemont Realty Partners, Ltd.* 116 N.M. 23, 26, 859 P.2d 491, 494 (Ct.App.1993)). We held there were questions of fact precluding summary judgment as to whether defendant had taken charge of a helpless person within the meaning of Restatement (Second) of Torts § 324 (1965).[1]

■ 9. More pertinent to our concerns here, we determined there were questions of helplessness and taking charge which could and should be answered by the jury, probably in response to special interrogatories. If the jury answered in the affirmative, the existence of a duty under Section 324 of the Restatement would be determined. We agree that if existence of a duty under established principles can be informed by answering specific factual inquiries, the factual decision should be left to the jury. In that instance, application of the normal summary judgment standard of review is appropriate.

■ 10. The case before us appears to be different. Characterizing an activity as inherently dangerous or as involving peculiar risk requires evaluation of the likelihood of harm occurring as a result of the activity. *Saiz*, 113 N.M. at 396, 827 P.2d at 111. In citing to a portion of the Restatement, *Saiz* described the necessary quantum of risk variously as: (1) the hazard must be substantial; (2) the work activity or the object sought to be obtained is very likely to cause harm if reasonable precautions are not taken; (3) the work is of such a nature that in the ordinary course of events its performance would probably, and not merely possibly, cause injury; and (4) the risk must be unusual, not a normal routine matter of customary human activity. *Id.;* Restatement § 413 cmt. b. None of these formulations of the test sug-

---

1. All references to "Restatement" hereinafter refer to the Restatement (Second) of Torts.

gest discrete, factual questions which could be submitted to a jury without effectively asking the ultimate question: Is this activity inherently dangerous? Thus we do not believe this case is susceptible to the approach successfully used in *Sarracino,* 117 N.M. at 194, 870 P.2d at 156.[2]

11. Victor has not provided us with, and we have not divined, a list of specific factual issues which are susceptible of submission to the jury and which would be helpful in deciding the ultimate issue of inherently dangerous activity. Given the public policy implications of a determination of inherently dangerous activity, we determine that an independent review of the record is more appropriate in this case. We are influenced by the state of the record before us; specifically, the lack of detailed findings of fact by the trial court. We do not fault the trial court for not making findings, since they are not required, or even encouraged, when deciding motions under Rule 1–056 NMRA 1997. As noted by the Supreme Court in *Attaway,* 117 N.M. at 146 n. 2, 870 P.2d at 108 n. 2, although findings of fact would be helpful, their lack does not preclude de novo review of the legal issue. In addition, the record is before us in the same format it was presented to the trial court. There are no issues of witness credibility and we are able to review the affidavits and deposition testimony with the same assurance as the trial court. We review the entire record and determine whether as a matter of sound public policy the risk posed by wave pools is sufficiently high to meet the tests set forth in *Saiz,* 113 N.M. at 396, 827 P.2d at 111.

*Wave Pool as an Inherently Dangerous Activity*

12. Turning to the merits, we review the material submitted to the trial court by the parties. Erisa, relying primarily on its status as a non-possessory landlord, presented very little information with regard to the issue of inherently dangerous activity.

Its basic theory was that wave pools are not significantly different from swimming pools, which were declared not to be inherently dangerous by our Supreme Court in *Seal v. Carlsbad Independent School District,* 116 N.M. 101, 103–04, 860 P.2d 743, 745–46 (1993). In addition, Erisa asserted that no other court in the country has recognized wave pools as inherently dangerous. Victor submitted two excerpted articles by an aquatics consultant, Jeff Ellis, who had provided safety consultation services to The Beach for the two seasons prior to Victor's incident. In addition, Victor submitted the affidavit of Thomas Ebro, a water safety expert retained specifically to review this case for the litigation.

13. It is reasonable to conclude from this material that wave pools are potentially more dangerous than ordinary pools, but we are not convinced that wave pools should be deemed to be inherently dangerous within the meaning of *Saiz.* For example, there is a large numerical difference in "life guard swimming rescues," with swimming pools encountering no more than 10 per year while wave pools may experience as many as 700 per operating season. These figures were presented by Ellis in very raw format, and it is therefore difficult to appreciate their significance for our purposes. Ellis attributes the majority of the difference to the relatively high volume of visitors to wave pools. Again in raw numbers, Ellis asserts that a typical public pool will receive 30,000 visitors per year while the average number of annual visits to wave pools can range between 250,000 to 800,000. Ellis also asserts that wave pools require additional training regimens and different standards of life guard performance because of the problems created by the size of the wave pools (up to a half an acre of surface area) and the movement of water not present in ordinary pools. The movement of water can be especially dangerous to first time users of wave pools who may not be accustomed to dealing with artificial

2. There is a practical litigation lesson to be gleaned from this discussion. That is, when arguing a motion to dismiss or for summary judgment on the ground of lack of duty, or other question of law, the parties should consider submitting for review all of their evidence on the question, essentially treating the motion as a trial on the legal question. Similarly, when discovery is incomplete, trial courts should consider deferring action on a motion for summary judgment until the record is ready for decision.

water movement. These statistics seem to indicate that wave pools are potentially more dangerous than ordinary pools. Arguing against a finding of inherently dangerous activity is the actual expected drowning rate, which is higher by a factor of ten for ordinary pools. Ordinary pools expect one drowning for every 280,000 visits while wave pools can expect one drowning per 3.7 million visits.

14. Ebro's conclusions and analysis are very similar to those of Ellis. Ebro asserts that "recreational activity in a wave pool is inherently more dangerous than bathing activity occurring in a typical swimming pool." Ebro bases his conclusions on the comparative size of the facilities as well as problems caused by congestion and water movement. He elaborates that the combination of congestion and water movement, with attendant collisions—body to body, body to basin, and body to waves—can cause fatigue, disorientation, and slips and falls, all resulting in a more difficult lifeguarding environment.

15. None of the material from Ellis or Ebro analyzes the danger of wave pools in the context of the *Saiz* test, even though the briefs submitted to the trial court articulated the test well. Our conclusion is that while wave pools present different risks from those found in ordinary swimming pools, the risks do not meet the *Saiz* test. To be deemed inherently dangerous, an activity must present an unusual or peculiar risk which creates a strong probability that harm will result in the absence of reasonable precautions. *Saiz*, 113 N.M. at 396, 827 P.2d at 111. A "peculiar risk" is one that is not a normal, routine matter of ordinary human activity. *Id.* There must be a special risk arising from the activity which requires special precautions. We agree with the trial court that wave pools meet neither criteria. The risks posed by wave pools are not unusual or beyond the realm of normal everyday human expectations. In addition, we cannot say that the risk is so great that injury is probable. We acknowledge there is a foreseeable risk of harm, perhaps greater than in ordinary swimming pools. However, simple foreseeability is not sufficient. *Id.* We conclude that the increased risks potentially

posed by wave pools are not sufficiently great to require, as a matter of public policy, application of a legal rule more stringent than ordinary negligence. We believe application of ordinary negligence rules adequately encourages reasonable and sufficient safeguards against the risks posed. *See id.* at 398, 827 P.2d at 113.

## NEGLIGENT ENTRUSTMENT

16. Victor asserts in his Second Amended Complaint that Erisa "had a duty to select a competent, careful lessee or concessionaire to operate the Wave Pool at The Beach as a public amusement[,]" and that Erisa breached that duty by failing to employ a competent concessionaire or lessee. The order granting summary judgment does not specify whether the trial court decided Erisa had no legal duty to Victor, or if it assumed a duty as described existed and then determined that Erisa was entitled to summary dismissal on the facts presented to it. We will review the purely legal question first.

17. Given the factual context of this case, the question of law we must answer is whether, and under what circumstances, a non-possessory landlord has a duty to exercise ordinary care in the selection of a tenant. *See Madrid v. Lincoln County Med. Ctr.*, 121 N.M. 133, 139, 909 P.2d 14, 20 (Ct.App.1995) (question of duty resolved by consideration of foreseeability and a policy determination whether defendant's obligation should be given recognition and effect by law), *aff'd on other grounds*, 122 N.M. 269, 923 P.2d 1154 (1996).

18. In *Madrid*, we noted that "[t]he question of duty [in tort cases] is an evolving concept under New Mexico law." *Id.* New Mexico cases have accepted foreseeability as an integral part of the analysis of duty. *See Ramirez v. Armstrong*, 100 N.M. 538, 540–43, 673 P.2d 822, 824–27 (1983), *overruled in part on other grounds by Folz v. State*, 110 N.M. 457, 460, 797 P.2d 246, 249 (1990); *Calkins v. Cox Estates*, 110 N.M. 59, 62, 792 P.2d 36, 39 (1990). "If it is found that a plaintiff, and injury to that plaintiff, were foreseeable, then a duty is owed to that plaintiff by the defendant." *Ramirez*, 100 N.M. at 541, 673 P.2d at 825. The

New Mexico cases are unclear whether foreseeability should be used to define duty in the first instance, or if it should simply govern the scope of a duty otherwise recognized. *See Torres v. State*, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995) (using foreseeability to define duty in first instance) *Bober v. New Mexico State Fair*, 111 N.M. 644, 649, 808 P.2d 614, 619 (1991) (using foreseeability to define scope of duty otherwise recognized); *Lopez v. Maez*, 98 N.M. 625, 631, 651 P.2d 1269, 1275 (1982) (deriving duty from statutory provision and using foreseeability to limit scope of duty); *Sanchez v. San Juan Concrete Co.*, 1997 NMCA 068, ¶ 12, 123 N.M. 537, 943 P.2d 571 (generally, duty is a question of law predicated on public policy).

19. If simple foreseeability were used as a fount for duty, we would have no difficulty finding a duty in this case. As described above, wave pools are different from ordinary swimming pools, and they require skilled management of the potential risks created by the water's movement. Absent knowledgeable management of the risk through numerically adequate and well-trained staff, drownings and near-drownings of children can be expected. In the language of *Madrid*, 121 N.M. at 139, 909 P.2d at 20, a particular plaintiff, particular events and particular injuries are foreseeable. It would thus be relatively easy to assert, in reaction to the potential danger, that a person in Erisa's position—i.e. the owner of a specialized water recreation facility—should be encouraged to guard against the danger by encouraging it to take care in the choice of person it allows to operate its facility.

20. But, as we also noted in *Madrid*, 121 N.M. at 139, 909 P.2d at 20, our cases also indicate that simple foreseeability is not necessarily determinative of the issue. *Cf. Trujillo v. Trujillo*, 104 N.M. 379, 382, 721 P.2d 1310, 1313 (Ct.App.1986) (holding that prior to effective date of NMSA 1978, § 41–11–1 (1986) tavern keeper was not liable to intoxicated person for injuries suffered as a result of serving him alcohol). Foreseeability may be determinative in the sense of remoteness, as discussed by Justice Ransom in his dissent in *Calkins*, 110 N.M. at 66, 792 P.2d at 43.

However, we do not believe that remoteness in this sense is an issue in this case.

21. Where the discussion of duty involves recognition of a new cause of action, or as here, extension of a recognized theory to a new setting, the issue is better framed as a question of policy. *See Torres*, 119 N.M. at 612, 894 P.2d at 389; *Sanchez*, 1997 NMCA 068, ¶ 12, 123 N.M. 537, 943 P.2d 571. The ultimate question is whether the law should give recognition and effect to an obligation from one person to another. In making these policy decisions, courts should be guided by "community moral norms and policy views, tempered and enriched by experience, and subject to the requirements of maintaining a reliable, predictable, and consistent body of law." *Sanchez*, 1997 NMCA 068, ¶ 12, 123 N.M. 537, 943 P.2d 571. The court should take into account the relationship of the parties, the plaintiff's injured interests, and the defendant's conduct. *Calkins*, 110 N.M. at 63, 792 P.2d at 40. In the absence of policy expressed in statutes or regulations, the principal source of guidance is legal precedent. *Sanchez*, 1997 NMCA 068, ¶¶ 12–15, 123 N.M. 537, 943 P.2d 571.

22. The parties have not cited any statutory or regulatory provisions bearing on the issue of a landlord's obligation when selecting a tenant, and we have found none. We therefore concentrate our inquiry on legal precedent and sound public policy considerations.

23. Our first task is to describe the elements and policy underpinnings of the theory of negligent entrustment. We will then determine whether the cause of action is compatible with the rules governing landlord tort liability.

*Negligent Entrustment Theory*

24. "Negligent entrustment" has become a short hand label for one species of recurring problem in tort law: that is, to what extent should the hypothetical reasonable person be expected to anticipate and guard against the conduct of potential tortfeasors for the protection of third persons. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 33, at 197–203 (5th ed.1984)

(hereinafter *Prosser & Keeton*). There is no need to exhaust or catalog the myriad potential combinations of persons and factual circumstances which might arise implicating this issue. That effort has already been made by commentators and academicians. *See id.* We need only explore the basis for the rule and decide if it may be applied here.

25. Section 302 of the Restatement states the general rule of ordinary care in this context as follows:

### ■ Risk of Direct or Indirect Harm

A negligent act or omission may be one which involves an unreasonable risk of harm to another through either

(a) the continuous operation of a force started or continued by the act or omission, or

(b) the foreseeable action of the other, a third person, an animal, or a force of nature.

Subsection (b) makes clear that a defendant may be held liable for failing to anticipate and guard against the foreseeable actions of third persons. Sections 302A and 302B of the Restatement describe specialized applications of the general rule. These sections reflect the common sense observation that all persons are deemed, or required to know the common qualities and habits of other human beings insofar as they are a matter of common knowledge in the community. *See* Restatement § 302 cmt. j. In certain circumstances, a person may have specialized knowledge of another, or should be required to gain specialized knowledge of the qualities or habits of another person. An obligation to investigate and consider the qualities and habits of another is particularly appropriate where the defendant has determined to allow the third person access to chattels belonging to the defendant, or where the defendant has chosen a third person to conduct an activity for the benefit of the defendant, and wrongful use of the chattel or negligent conduct of the activity carries an unreasonable risk of harm.

■ 26. Section 308 of the Restatement is the general description of the theory of negligent entrustment. It states:

### Permitting Improper Persons to Use Things or Engage in Activities

It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

It should be noted that the section allows use of the theory in the context of chattels (use of a thing), or in the broader context of engagement in an activity. Section 390 of the Restatement states a specialized rule pertinent to automobiles. However, there is nothing in the language of Sections 302, 308 or 390 of the Restatement which specifically precludes application of the theory in the context of a lease of real estate for a particular purpose.

27. The more important feature of Section 308 is the idea that the "third person is entitled to possess or use the thing or engage in the activity only by the consent of the actor, and that the actor has reason to believe that by withholding consent he can prevent the third person from using the thing or engaging in the activity." Section 308 cmt. a. The inference is that absent the tortfeasor's access to the thing or activity, the risk of harm is appreciably reduced.

■ 28. The basic premise for negligent entrustment liability is that there are times when one may not assume that human beings will conduct themselves properly. If the defendant knows of facts, or should know of facts, which would lead a reasonable person to realize that a third party is unlikely to conduct himself properly, the defendant is under an obligation to exercise ordinary care in making the decision to entrust the chattel or property to the potentially negligent third person.

■ 29. New Mexico courts have had relatively few opportunities to address the negligent entrustment theory. Citing Restatement § 308, we explicitly recognized negligent entrustment claims in the context of automobiles. *See McCarson v. Foreman*, 102 N.M. 151, 155–56, 692 P.2d 537, 541–42 (Ct.App.1984); *DeMatteo v. Simon*, 112 N.M.

112, 114, 812 P.2d 361, 363 (Ct.App.1991). In *McCarson*, 102 N.M. at 155, 692 P.2d at 541, we held that "[g]eneral principles of negligence are relevant to the determination of negligent entrustment." We understand this observation to indicate that the defendant's act of entrusting the thing or activity is to be measured against the standard of ordinary care of the reasonable person, and that the plaintiff has the burden of demonstrating proximate causation between the entrustment and the injury. We further observed in *McCarson* that the theory did not require that the entrustment be contemporaneous with an incident of negligence. "Rather, unfitness to drive might exist as a result of habits of which the entruster is actually aware or of which he should know." *Id.* at 156, 692 P.2d at 542.

30. Erisa correctly notes that in New Mexico negligent entrustment has only been applied, or even discussed, in the context of chattel entrustments. Relying on the general rule that a non-possessory or lessor who has not retained control of the leased premises may not be held liable for injuries caused by conditions on the leased premises arising after execution of the lease, Erisa argues it would be improper to extend the concept to leases of real property. *See Gourdi v. Berkelo*, 122 N.M. 675, 677–78, 930 P.2d 812, 814–15 (1996) (no continuing duty of inspection absent knowledge or notice of defects even when landlord has retained a general right to reenter and inspect premises); *Rummel*, 116 N.M. at 26, 859 P.2d at 494 (absent possession, or sufficient retained control of premises, non-possessory landlord owed no duty of care to protect employees of tenant from criminal acts of third party).

31. Erisa also argues that negligent entrustment cannot apply because it was no longer in control of The Beach at the time of the incident in which Victor was injured. In this argument, and its statement of the general rule protecting landlords from liability, Erisa focuses solely on a lessor's lack of responsibility for events occurring after the landlord has given up possession. At bottom, Erisa's argument is that it owed no duty of care to Victor after the lease was in effect, and thus, could not owe him a duty before the lease was entered into. We acknowledge the force of Erisa's arguments, but we do not believe they provide a complete resolution of the issue.

32. Erisa's arguments miss the mark because they address the wrong time frame and the wrong theory of liability. "The rationale of the 'negligent entrustment' cases is not founded upon the negligence of the driver of the automobile but upon the *primary* negligence of the entruster in supplying the chattel ... to an incompetent and reckless driver." *McKee v. United Salt Corp.*, 96 N.M. 382, 385 n. 1, 630 P.2d 1237, 1240 n. 1 (Ct.App.1980) (quoting *Upland Mut. Ins. Inc. v. Noel*, 214 Kan. 145, 519 P.2d 737, 742 (1974)), *rev'd in part on other grounds*, 96 N.M. 65, 628 P.2d 310 (1981). Negligent entrustment is not a theory of vicarious liability, such as respondeat superior in the employer/employee context. *See Neale v. Wright*, 322 Md. 8, 585 A.2d 196, 199 (1991) ("The cause of action for negligent entrustment does not rest on a theory of vicarious liability; it may be maintained against a person who, because he or she entrusts personal property to a known 'reckless' individual, is directly negligent."); *Syah v. Johnson*, 247 Cal.App.2d 534, 55 Cal.Rptr. 741, 744–45 (1966) (discussing distinction between doctrine of negligent entrustment and theory of vicarious liability). Additionally, liability for negligent entrustment is not dependent on the defendant's failure to actually control the actions of the third party tortfeasor. Rather, liability is premised on allowing the tortfeasor access to the offending instrumentality or allowing the tortfeasor to undertake an activity which causes harm in circumstances where the defendant knew or should have known of the tortfeasor's incompetence or recklessness. *Id.;* Restatement §§ 302 cmt. g, 302A, 308, and 390.

*Landlord Tort Liability*

33. The more direct inquiry is whether there is something fundamental about the law of landlord liability which makes it simply incompatible with negligent entrustment. As we have noted, non-possessory landlords occupy a relatively privileged position at common law with regard to liabili-

ty for injuries suffered on the leased premises. Because the lease is treated as equivalent to sale of the premises for the term, the general rule is that landlords are not liable for injuries suffered during the tenancy, in particular when the harm is caused by conditions which come into existence after the lessee takes possession. *Gourdi*, 122 N.M. at 677, 930 P.2d at 814; *Lommori v. Milner Hotels, Inc.*, 63 N.M. 342, 346, 319 P.2d 949, 952 (1958).

■ 34. There are at least five accepted exceptions to the rule: (1) when the landlord knows of a hidden defect and does not communicate that knowledge to the tenant; (2) when the landlord binds himself by a covenant to repair; (3) when the landlord reserves control of part of the premises for common use by tenants and/or the public; (4) when the injury is to persons off the premises caused by the landlord's ordinary negligence; and (5) when the land is leased for purposes involving admission of the public. *Lommori*, 63 N.M. at 346–47, 319 P.2d at 952; Restatement §§ 355–362. Neither the general rule nor the exceptions answer our question directly because they basically concern themselves with the landlord's liability for acts directly connected with the physical condition of the leased premises and the landlord's obligation, or lack thereof, to remedy unsafe conditions on the premises after possession passes to the tenant. These rules do not deal with the issue whether the landlord should exercise ordinary care in the selection of the tenant prior to granting possession.

35. The common law rules are, however, instructive in another sense. First, the exceptions to the general rule of non-liability indicate a trend in the law to narrow the scope of the traditional immunity. This narrowing has proceeded so far as to prompt some commentators to assert that to a large extent the exceptions have swallowed the general no-duty rule. *See, e.g., Prosser & Keeton*, § 63, at 435. Thus, to the extent we may apply negligent entrustment principles to leases of real property, we would be following the modern trend of providing increased protection to persons injured on leased premises.

■ 36. Second, the Restatement recognizes that under certain circumstances a possessor of property may be under a duty to control, or attempt to control, the activities of persons using its lands. Restatement § 318. This is an issue different from that which we face in this case since negligent entrustment concerns itself with the defendant's actions prior to lease—or entrustment—of the property, rather than its actions subsequent to the lease. But, it does indicate that a landlord can be required to guard against the acts of others on the property.

37. Third, Section 359(b) of the Restatement provides for liability in situations analogous to negligent entrustment cases. Section 359(b) provides:

**Land Leased for Purpose Involving Admission of Public**

A lessor who leases land for a purpose which involves the admission of the public is subject to liability for physical harm caused to persons who enter the land for that purpose by a condition of the land existing when the lessee takes possession, if the lessor

. . .

(b) has reason to expect that the lessee will admit them before the land is put in safe condition for their reception[.]

38. Thus, the landlord is subject to liability if it is aware, or should be aware that the tenant will not act to put the premises in safe condition before the public is admitted. Liability is imposed on the landlord for the tenant's failure to act, apparently regardless of the reason for the failure, whether it is lack of finances, incompetence, lack of knowledge of the defect or mere inadvertence. This is liability based on the failure to act of a third person, and is thus analytically related to the theory of negligent entrustment, which simply requires the defendant to consider the consequences of allowing another person to use its chattels or pursue its activity.

39. There are no New Mexico cases adopting Section 359 of the Restatement and, for reasons already explained, there is no need to adopt it in this case. We are not concerned with the condition of the land as

such. It is enough for purposes of this case that the law has imposed liability on the landlord for injuries caused by the tenant's failure to act. A reasonable corollary to this rule would be a duty of ordinary care in selecting the tenant, thus reducing the possibility that the tenant will act in a manner detrimental to the expected public use.

40. There are other indications in New Mexico law that lessors do not occupy as favored a position of immunity as the general common law rule implied. New Mexico has followed the relatively recent trend of recognizing a general tort duty of landlords who retain a certain degree of control or possession of their premises to protect tenants and their employees from negligent and criminal activity, whether engaged in by other tenants or strangers to the property. *See Ciup v. Chevron USA, Inc.,* 122 N.M. 537, 539, 928 P.2d 263, 265 (1996); *Rummel,* 116 N.M. at 26, 859 P.2d at 494. We recognize that in these two cases there was not sufficient evidence of the requisite degree of control or possession on the part of the defendant landlord to support application of the duty. But that does not diminish the assertion that the immunity of landlords has been narrowed and a duty imposed to guard against the actions of third persons.

41. In addition, our Supreme Court has stated that landlords have a general duty to exercise ordinary care for the safety of others. *Gourdi,* 122 N.M. at 677, 930 P.2d at 814 (citing *Bober,* 111 N.M. at 649–50, 808 P.2d at 619–20). We do not take these statements to mean that the rather specialized rules of tort liability applicable to owners and occupiers of land have been entirely abrogated. We do believe, however, that *Gourdi* and *Bober* can be read to mean that arbitrary rules of immunity disconnected from reasonable implications which flow from the right or ability to control or affect activity on property have been rejected by the New Mexico courts. Applying a general duty of ordinary care, there is no fundamental policy reason why a person leasing property should not be required in appropriate circumstances to use such care in selecting a tenant.

42. Finally, the issue of duty here is analogous to the duty of an employer to exercise reasonable care to employ a competent and careful contractor. *See* Restatement § 411. Liability under this section can be analyzed as another instance in which a defendant is required to guard against the foreseeable actions of a third party tortfeasor. The analogy to negligent entrustment under Sections 302, 308 and 390 of the Restatement is strong in that liability under Section 411 attaches only when the harm results "from some quality in the contractor which made it negligent for the employer to entrust the work to him." Restatement § 411 cmt. b. There is no indication in the Restatement that the duty described in Section 411 should not be imposed on landlords. In fact, it is likely that the issue most often arises in cases involving owners or occupiers of property.

43. We recognize that New Mexico has not adopted Section 411, and we need not do so here. It is enough to note that the Restatement recognizes the potential for a landowner to be liable for the acts of another person resulting from a failure to exercise care in employing the third person, which is the essence of negligent entrustment. *See Otero v. Jordon Restaurant Enter.,* 119 N.M. 721, 723, 895 P.2d 243, 245 (Ct.App.1995) (adopting Section 422(b) of the Restatement which describes a nondelegable duty on part of one in control of premises for negligent work done by an independent contractor after he or she has resumed possession of the land upon completion of the work), *aff'd on other grounds,* 122 N.M. 187, 922 P.2d 569 (1996).

44. We conclude that the law of landlord tort liability and negligent entrustment are not incompatible, and given the nature of the property and activity involved here, and the relationship between Erisa, Jay–Bi and Victor, we believe it is reasonable to impose on Erisa an obligation to exercise reasonable care in the selection of its tenant.

45. Erisa is the owner of a property which can only be used as a water park. The lease between Erisa and Jay–Bi requires the tenant to operate the property as a water park. The lease provides that rents will be determined at least in part on a percentage

of gross sales from the water park operations. We have already detailed the potential for danger inherent in operation of a wave pool. Erisa knew, or should have known, of the injury-causing potential of the wave pool. Agents of Erisa knew Mr. Bomaster, principal of Jay–Bi, and were aware he had no experience in operating wave pools or water parks. Under these circumstances, it is not unreasonable to require Erisa to exercise ordinary care in the selection of a tenant. Ordinary care at the least would include investigation of the knowledge and experience potential tenants had in management of wave pools.

46. We do not intend this duty to be applied broadly. Absent specific, compelling facts most real estate lease transactions will not implicate a duty to investigate the background of potential lessees. Where, however, as here, the property is designed, intended and required to be used for a particular purpose, and the use "has highly dangerous potentialities involving a substantial risk to the general public, and such danger or risk to the public is such that it may be foreseen by the lessor, the lessor owes a duty of reasonable care in selecting and entrusting such property to a lessee." *Benlehr v. Shell Oil Co.*, 62 Ohio App.2d 1, 402 N.E.2d 1203, 1209 (1978) (recognizing negligent entrustment in connection with lease of a gasoline service station) (footnote omitted). Limitation of the duty reflects both the traditional favor accorded landlords and the Restatement rationale for imposing potential liability on one person for the acts of another. The duty as we have defined it applies when the landlord is in effect requiring, or allowing, another to undertake an activity with known potential hazards for landlord's economic benefit. This restriction of the duty is also similar to our limitation of negligent entrustment in *Spencer v. Gamboa*, 102 N.M. 692, 694, 699 P.2d 623, 625 (Ct.App.1985) where we determined that as a matter of policy we should not impose an affirmative duty on car dealers to learn the qualifications of potential customers when allowing automobile test drives.

*Summary Judgment on Negligent Entrustment Claim*

47. Having determined there is a duty of ordinary care in selection of tenants, we now turn to the question whether there were material issues of fact defeating summary judgment on this claim. In general, in order to recover on a theory of negligent entrustment, a plaintiff must prove that the entruster knew or should have known that the tortfeasor was incompetent or otherwise unfit to operate the property entrusted to him or undertake the activity entrusted to him, and that the defendant allowed the tortfeasor unrestricted use or access. *McCarson*, 102 N.M. at 155, 692 P.2d at 541, *DeMatteo*, 112 N.M. at 114, 812 P.2d at 363.

48. The record indicates that Jay Bomaster, the principal of the tenant did not have any knowledge of, or experience in, the management and operation of water parks prior to execution of the lease. Employees of Erisa had met Mr. Bomaster and knew him when he had worked as a food concessionaire with the prior operator of the park. Erisa approached Mr. Bomaster with the idea of allowing him to lease the property and operate the water park for Erisa. Mr. Bomaster initially declined the opportunity on the grounds that he did not have sufficient capital to adequately fund the operation. Erisa repeated the offer to Mr. Bomaster at a later date and he eventually accepted. Erisa was aware that Mr. Bomaster did not have any knowledge of or direct experience in the operation of water parks and wave pools. Erisa required in the lease that the property would be operated as a water park and that the use of the property could not be changed without its permission.

49. These facts, in combination with the evidence previously outlined concerning the potential for danger in wave pools, are sufficient to create a question of fact regarding whether Erisa exercised ordinary care in the selection of Jay–Bi and Mr. Bomaster as its tenant.

*CONCLUSION*

50. We affirm the trial court's dismissal of Victor's claim that wave pools are inherently dangerous, thus imposing a non-delega-

ble duty on Erisa for the safety of water park patrons. We hold that negligent entrustment is a proper theory under the circumstances of this case. Victor stated a negligent entrustment claim upon which relief may be granted, and there are questions of facts precluding summary judgment. Dismissal of the negligent entrustment claim is reversed and the matter is remanded for further proceedings consistent with this opinion.

51. **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.