# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-028

Filing Date: July 19, 2021

No. S-1-SC-37997

FRANKLIN J. MORRIS, as personal
representative of the wrongful death estate
of Marcellino Morris, Jr. (deceased),

      Plaintiff-Appellant,

v.

GIANT FOUR CORNERS, INC.,
d/b/a Giant #7251

      Defendant-Appellee.

**CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**
**Gregory A. Phillips, Bobby R. Baldock, and Nancy L. Moritz, Circuit Judges**

Released for Publication November 23, 2021.

The Law Office of Sean P. McAfee
Sean P. McAfee
Albuquerque, NM

Davis Kelin Law Firm, LLC
Zackeree S. Kelin
Albuquerque, NM

for Appellant

Rodey, Dickason, Sloan, Akin, & Robb, P.A.
Andrew G. Schultz
Albuquerque, NM

for Appellee

## OPINION

**BACON, Justice.**

**{1}** This matter comes before this Court upon a question certified to us by the United States Court of Appeals for the Tenth Circuit. Specifically, the Tenth Circuit asked this Court to address the following:

> Under New Mexico law, which recognizes negligent entrustment of chattel as a viable cause of action, does a commercial gasoline vendor owe a duty of care to a third party using the roadway to refrain from selling gasoline to a driver it knows or should know to be intoxicated?

**{2}** Upon review, we answer this question in the affirmative.

## I.  BACKGROUND

**{3}** Plaintiff Franklin J. Morris, as Personal Representative of the Wrongful Death Estate of Marcellino Morris, Jr., originally filed his complaint in the District Court of the Navajo Nation. The district court found on summary judgment that Plaintiff's complaint was barred because the Navajo Nation's two-year statute of limitations for personal injury had lapsed.[1] Plaintiff filed a parallel action in the New Mexico Eleventh Judicial District Court alleging, in part, that Defendant, Giant Four Corners, negligently entrusted gasoline to an intoxicated driver who subsequently killed Plaintiff's son in an auto accident. Defendant removed the case to the United States District Court for the District of New Mexico.

## A.  The Accident

**{4}** In his pleadings before the United States District Court, Plaintiff provided the following factual background of the events in question. On December 29 and 30, 2011, during a night of drinking extending into the early morning, Andy Denny drove his automobile until it ran out of gasoline near Tohatchi, New Mexico. Denny and his passenger walked to Defendant's gas station in Tohatchi to purchase gasoline so that Denny could continue driving. Upon arrival at the gas station, both Denny and his passenger were intoxicated.

**{5}** While at the gas station, Denny learned that there were no empty gas cans for sale. Denny and his passenger decided to purchase a gallon of water and empty it to use as a container for gasoline. Initially, because they were intoxicated, the clerk working at the gas station would not sell anything to Denny or his passenger, but the clerk ultimately sold the gallon of water and a gallon of gasoline to Denny. After filling the gallon container with gas, Denny and his passenger left on foot and walked back to Denny's vehicle. Denny and his passenger then drove back to the gas station and purchased an additional nine gallons of gasoline for Denny's car.

---

1Plaintiff appealed this decision to the Navajo Nation Supreme Court, which affirmed the order of the District Court of the Navajo Nation on summary judgment. *Morris v. Giant Four Corners Inc.*, Navajo Nation Supreme Court, No. SC-CV-13-15, 7 (Aug. 10, 2020).

**{6}**    After driving away from the gas station, Denny dropped off his passenger. He then returned to the highway. As he drove, his vehicle crossed the centerline and then collided with the oncoming vehicle of Marcellino Morris. Morris was killed in the collision.

**{7}**    An officer responded to the scene of the accident where he observed signs that Denny was intoxicated. The officer also observed that Denny was repeatedly dozing off. At the scene of the accident, Denny took a breathalyzer test "and blew a 0.080 BAC." Nearly four hours after the accident, a blood sample revealed Denny's blood alcohol concentration of 0.176. Denny was arrested for driving while under the influence, vehicular homicide, and driving left of center.

## B.    The Federal Court Proceedings

**{8}**    Plaintiff's Complaint for Wrongful Death included claims against Defendant[2] for vicarious liability for negligent entrustment of chattel[3] and direct liability for negligent hiring, training, and supervision. Toward the outset of the litigation in the United States District Court, Plaintiff filed a motion for partial summary judgment on his negligent entrustment of chattel claim. The district court denied the motion because the facts were not sufficiently developed but assumed for purposes of the motion before it that Defendant owed Plaintiff a duty "to refrain from making an entrustment that created an appreciable risk of harm." Subsequently, Defendant moved for judgment on the pleadings, asserting that New Mexico law does not create a duty to refrain from selling gasoline to an intoxicated driver. The United States District Court granted the motion for judgment on the pleadings. In its order, the district court recognized that New Mexico has adopted the doctrine of negligent entrustment of chattel. The district court also acknowledged that, in the context of negligent entrustment, an owner or controller of chattel has "a duty to others not to give control of a dangerous instrumentality to a person incapable of using it carefully." The district court, however, declined to find that Defendant owed a duty to Plaintiff, because no New Mexico statutes or cases specifically imposed a duty "to refrain from selling gasoline to an allegedly intoxicated driver." The district court also observed that the New Mexico Supreme Court, rather than the federal court sitting in diversity jurisdiction, was better positioned to resolve this question of state law. Plaintiff appealed the order of the United States District Court to the United States Court of Appeals for the Tenth Circuit, which in turn certified the question to this Court pursuant to Rule 12-607(A), (C) NMRA.

## II.    DUTY

**{9}**    The Tenth Circuit asks this Court to address, in the context of our adoption of negligent entrustment of chattel, whether a vendor of gasoline has a duty to refrain from selling gasoline to a driver it knows or should know is intoxicated. To answer this question, we must examine whether Defendant owed a duty of care to Plaintiff to refrain

---

2Plaintiff also made claims against Denny, which were subsequently dismissed.
3To assist in the analysis, this opinion describes and defines the roles of "actor" and "entrustor" both with regard to this case and when analyzing supporting authority.

from selling gasoline to a driver Defendant knew or had reason to know was intoxicated. This is a question previously unanswered by this Court.

**{10}** The determination of whether a duty exists is a matter of law and a question of policy made "with reference to legal precedent, statutes, and other principles comprising the law." *Calkins v. Cox Estates*, 1990-NMSC-044, ¶ 8, 110 N.M. 59, 792 P.2d 36. "A duty may exist based on statutory law; based on common law that has created an affirmative duty toward a specific individual or group of individuals; or based on a general negligence standard, which requires an individual to exercise reasonable care in his dealings and activities with the public." *Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 2007-NMCA-122, ¶ 30, 142 N.M. 583, 168 P.3d 155 (considering whether an employer owed a duty to members of the motoring public when the employer hired the employee to drive).

**{11}** In determining "whether a duty of care exists or should be expanded or contracted," a court's analysis "should focus on policy considerations when determining the scope or existence of a duty of care." *Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 2014-NMSC-014, ¶ 19, 326 P.3d 465. When deciding the scope of a duty or whether an existing duty should be limited, a court must "articulate specific policy reasons" for its conclusion. *Id.* ¶ 1; *see also* Restatement (Third) of Torts: Duty § 7 cmt. j (Am. L. Inst. 2010) ("[A no-duty] ruling should be explained and justified based on articulated policies or principles that justify exempting these actors from liability or modifying the ordinary duty of reasonable care."). When assessing the existence or scope of a duty, a court does not analyze foreseeability or weigh the evidence. *Rodriguez*, 2014-NMSC-014, ¶¶ 1, 19. "Foreseeability is a fact-intensive inquiry relevant only to breach of duty and legal cause considerations" and is often left to the jury. *Id.* ¶ 1 (holding that when a court considers foreseeability, "it is to analyze no-breach-of-duty or no-legal-cause as a matter of law, not whether a duty exists"). Similarly, "[c]ourts should not engage in weighing evidence to determine whether a duty of care exists or should be expanded or contracted—weighing evidence is the [province] of the jury . . . ." *Id.* ¶ 19.

**{12}** The question before us focuses on the duties arising from negligent entrustment. We must determine, de novo, whether New Mexico's legal precedent, statutes, or other principles of law impose a duty in the context of a commercial gasoline vendor selling gas to an intoxicated driver. *See Calkins*, 1990-NMSC-044, ¶ 8 ("The court must determine *as a matter of law* whether a particular defendant owes a duty to a particular plaintiff.").

## A.    Negligent Entrustment of Chattel

**{13}** For decades, New Mexico courts have recognized negligent entrustment and negligent entrustment of chattel as viable causes of action. *See McCarson v. Foreman*, 1984-NMCA-129, ¶¶ 10, 13, 102 N.M. 151, 692 P.2d 537. In *McCarson*, the Court of Appeals recognized that "[g]eneral principles of negligence are relevant to the determination of negligent entrustment." *Id.* ¶ 13. Under those general principles, a finding of negligence requires that the defendant owed the plaintiff a duty. *Herrera v.*

*Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 73 P.3d 181 ("Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages."); *Baxter v. Noce*, 1988-NMSC-024, ¶ 11, 107 N.M. 48, 752 P.2d 240 ("A duty is a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class or persons.").

**{14}**    In adopting the tort of negligent entrustment of chattel, New Mexico courts have relied on Permitting Improper Persons to Use Things or Engage in Activities (§ 308) and Chattel for Use by Person Known to be Incompetent (§ 390) of the Restatement (Second) of Torts (Am. L. Inst. 1965) (hereinafter Restatement) and its comments. *See McCarson*, 1984-NMCA-129, ¶ 13 (adopting the description of negligent entrustment from the Restatement § 308 in application to chattel); *Armenta v. A.S. Horner, Inc.*, 2015-NMCA-092, ¶ 12, 356 P.3d 17 (same, and discussing application to automobiles); *Sanchez v. San Juan Concrete Co.*, 1997-NMCA-068, ¶¶ 21-23, 123 N.M. 537, 943 P.2d 571 (discussing the application of negligent entrustment from Section 390 where intoxication of the entrustee may incur foreseeable harm). Section 308 states:

> It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

Restatement § 308.

**{15}**    Section 390 specifically applies the doctrine of negligent entrustment, as described in Section 308, to chattel:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

Restatement § 390. Comment a to Section 390 provides that negligent entrustment includes "*sellers*, lessors, donors, lenders, and to all kinds of bailors." (Emphasis added.) Comment c to Restatement Section 390 goes further:

> [I]f the supplier knows that the condition of the person to whom the chattel is supplied is such as to make him incapable of exercising the care which it is reasonable to expect of a normal sober adult, the supplier may be liable for harm sustained by the incompetent although such person deals with it in a way which may render him liable to third persons who are also injured.

**{16}** Because generally there can be no liability without duty, *see Herrera*, 2003-NMSC-018, ¶ 6, inherent in the liability described by Sections 308 and 390 is the duty to refrain from supplying chattel to a person the supplier knows or has reason to know is likely to use the chattel in a manner creating unreasonable risk of physical harm to the entrustee or others. *See Casebolt v. Cowan*, 829 P.2d 352, 360 (Colo. 1992) ("The rationale underlying imposition of negligent entrustment liability on suppliers of chattels is that one has a duty not to supply a chattel to another who is likely to misuse it in a manner causing unreasonable risk of physical harm to the entrustee or others."); *Martell v. Driscoll*, 302 P.3d 375, 380 (Kan. 2013) ("The language of [Section 390] establishes that a supplier of a chattel has a duty not to give control of the chattel to a person whom the supplier knows or has reason to know is incompetent or incapable of properly using the chattel.").

**{17}** New Mexico has clearly relied on Restatement Sections 308 and 390 to set a framework for negligent entrustment and negligent entrustment of chattel. *Armenta*, 2015-NMCA-092, ¶ 12; *Sanchez*, 1997-NMCA-068, ¶¶ 21, 23; *Hermosillo v. Leadingham*, 2000-NMCA-096, ¶ 19, 129 N.M. 721, 13 P.3d 79; *McCarson*, 1984-NMCA-129, ¶ 13. However, no New Mexico cases have applied the doctrine of negligent entrustment of chattel, as described by the Restatement, outside of the context of the negligent entrustment of automobiles.[4] *See Armenta*, 2015-NMCA-092, ¶ 12; *Sanchez*, 1997-NMCA-068, ¶¶ 11-12, 28; *McCarson*, 1984-NMCA-129, ¶¶ 10-11, 13; *DeMatteo v. Simon*, 1991-NMCA-027, ¶¶ 5-6, 112 N.M. 112, 812 P.2d 361; *Hermosillo*, 2000-NMCA-096, ¶ 20; *see also* UJI 13-1646 NMRA use cmt. (noting that the instruction may apply to chattels other than automobiles), committee cmt. (noting that negligent entrustment of chattel claims have been recognized in the context of automobiles but not real property). When recognizing the claims for the negligent entrustment of automobiles and the duty to refrain from such entrustment, New Mexico courts have identified policy considerations that support measures to decrease driving while intoxicated. *Armenta*, 2015-NMCA-092, ¶¶ 14-19; *Sanchez*, 1997-NMCA-068, ¶¶ 12, 16, 19-20. Driving while intoxicated presents an unreasonable risk of harm to the public as described in Section 390 of the Restatement. Restatement § 390 ("One who supplies . . . a chattel for the use of another whom the supplier knows or has reason to know to be likely . . . to use it in a manner involving *unreasonable risk of physical harm to himself and others* . . . is subject to liability for physical harm resulting to them." (emphasis added)).

**{18}** As we have stated herein, negligent entrustment and negligent entrustment of chattel, as described in Sections 308 and 390 of the Restatement, respectively, arise out of general principles of negligence and are viable causes of action in New Mexico. The question that remains is whether this duty inherent to that described in Sections 308 and 390 applies to vendors of gasoline who sell gasoline to an intoxicated driver. Both parties acknowledge that New Mexico has recognized the tort of negligent entrustment of chattel. Further, both parties agree that negligent entrustment is tied to

---

[4]Plaintiff cites *Smith v. Bryco Arms*, 2001-NMCA-090, 131 N.M. 87, 33 P.3d 638, as an example of a New Mexico case applying negligent entrustment of chattel to the sale of firearms. However, that case involves principles of product liability, rather than principles of negligent entrustment of chattel. *See id.* ¶¶ 26-28.

general principles of negligence. Where the parties fundamentally disagree is how far New Mexico's adoption of negligent entrustment, and its inherent duty, extends.

**{19}** Plaintiff asserts that the tort of negligent entrustment recognizes a general duty of ordinary care on the part of a defendant to refrain from selling or entrusting chattel if the sale or entrustment will cause unacceptable risk. Plaintiff further argues that because New Mexico courts have recognized the tort of negligent entrustment of chattel, Restatement Sections 308 and 390 impose a duty of ordinary care that applies to everyone entrusting chattel to another and does not limit liability to a specific category of chattel or type of entrustment. Plaintiff asserts that liability for selling gasoline to a person the vendor knows or has reason to know is an intoxicated driver falls neatly into the general rule that a supplier of chattel is liable for entrusting chattel to a person the supplier knows or should know is likely to use it in a manner creating unreasonable risk to the entrustee or others. Plaintiff thus contends that the proper question presented by this case is whether any policy considerations favor exempting gasoline vendors from the duty under the doctrine of negligent entrustment of chattel.

**{20}** Defendant disagrees, citing *Baxter*, 1988-NMSC-024, ¶ 11, and arguing that while negligent entrustment provides a general duty of care, there must be a specific, legal duty to support Plaintiff's expansion of negligent entrustment. Defendant argues that for a claim of negligent entrustment to be viable here, there must be a separate finding that imposes a duty upon Defendant to refrain from selling gasoline to an intoxicated driver. According to Defendant, there is no existing duty in this context because no New Mexico case applies negligent entrustment of chattel to the sale of gasoline.

**{21}** As an initial matter, we clarify that liability for negligent entrustment of chattel arises out of an entrustor's control of chattel, which is generally, as in this case, independent of any relationship between the parties. *See Hermosillo*, 2000-NMCA-096, ¶ 20 (holding that a plaintiff's negligent entrustment claim failed because a husband lacked ownership and control of the vehicle with which his wife hit the plaintiff's vehicle); *Casebolt*, 829 P.2d at 360 ("Liability for the negligence of the incompetent driver to whom an automobile is entrusted does not arise out of the relationship of the parties, but from the act of entrustment of the motor vehicle." (internal quotation marks and citation omitted)); 2 Dan B. Dobbs et. al, *The Law of Torts* § 422, at 748-55 (2d ed. 2011) (explaining that the duty to refrain from negligently entrusting chattel arises out of the owner's control of that chattel). Defendant contends "that there is no duty to control a third person's conduct so as to prevent personal harm to another." *See* Restatement (Second) of Torts: Duty to Act for Protection of Others § 314; *Grover v. Stechel*, 2002-NMCA-049, ¶ 11, 132 N.M. 140, 45 P.3d 80 ("As a general rule, an individual has no duty to protect another from harm."). Defendant asserts that the only exception to this general rule is where a special relationship exists between the actor and the person injured or the actor and the third person. *Johnstone v. City of Albuquerque*, 2006-NMCA-119, ¶ 14, 140 N.M. 596, 145 P.3d 76 (recognizing that special relationships "give rise to a special responsibility, and take the case out of the general rule."). Defendant argues that because there is no connection between Defendant and the unknown motoring public or between the vendor and the intoxicated person, there is no

such special relationship here. However, negligent entrustment requires that the person liable must control the chattel and have "reason to believe that by withholding consent he can prevent the third person from using the thing," not that a special relationship exists. Restatement § 308 cmt. a.

**{22}** The dissent, sua sponte, takes the position that despite this Court having previously adopted, without limitation, the doctrine of negligent entrustment described by the Restatement, we are required to limit negligent entrustment to the context of bailments. Dissent ¶ 54; *Armenta*, 2015-NMCA-092, ¶ 12 ("New Mexico has adopted the general definition of negligent entrustment from the Restatement (Second) of Torts."). In advancing this position, the dissent does not address Restatement Section 390, which establishes that negligent entrustment occurs when a chattel is *supplied*, without distinguishing between "sellers, lessors, donors or lendors, and . . . bailors." Restatement § 390 cmt. a. Nor does the dissent address the multitude of courts that have concluded that negligent entrustment includes sales and commercial transactions. *Vince v. Wilson*, 561 A.2d 103, 105 (Vt. 1989) (concluding that Section 390 applies to sales and creates a duty to refrain from selling a car to a known incompetent driver); *Bernethy v. Walt Failor's, Inc.*, 653 P.2d 280, 283 (Wash. 1982) (concluding that seller of gun to intoxicated purchaser owes duty to decedent pursuant to Section 390); *Jacoves v. United Merch. Corp.*, 11 Cal. Rptr. 2d 468, 485 (Cal. Ct. App. 1992) (acknowledging that negligent entrustment extends to commercial sales); *Ireland v. Jefferson Cnty. Sheriff's Dep't*, 193 F. Supp. 2d 1201, 1229 (D. Colo. 2002) (acknowledging that Section 390 applies to sellers); *Rains v. Bend of the River*, 124 S.W.3d 580, 596-97 (Tenn. Ct. App. 2003) (stating that there is wide agreement that merchants are suppliers of chattel).

**{23}** The dissent begins its discussion of limiting negligent entrustment to bailment by relying on *Rush v. Smitherman*, 294 S.W.2d 873 (Tex. App. 1956). Dissent ¶ 60. While *Rush* concluded that in Texas negligent entrustment does not include sales, Texas had not adopted Section 390. *Nat'l Convenience Stores, Inc. v. T.T. Barge Cleaning Co.*, 883 S.W.2d 684, 686 (Tx. App. 1994). The Florida Supreme Court also declined to adopt Section 390 as it applies to the sale of automobiles, in part because a state statute established a bright line rule that restricts "liability to automobile owners in possession (beneficial or legal)." *Horne v. Vic Potamkin Chevrolet, Inc.*, 533 So. 2d 261, 262-63 (Fla. 1988). As the Florida Supreme Court's holding aligned with its state statute, rather than the Restatement, the Florida Supreme Court recognized that the comments accompanying Section 390 "leave little doubt that the section is meant to apply to sellers . . . ." *Id.* The other cases the dissent relies upon for its narrow definition of negligent entrustment either fail to address Section 390, *Thompson v. Mindis Metals, Inc.*, 692 So.2d 805, 807 (Ala. 1997); *Buczkowski v. McKay*, 490 N.W.2d 330 (Mich. 1992), or avoid answering the question of "whether a negligent entrustment claim can be asserted in a sales transaction," *Estate of Pemberton v. John's Sports Ctr., Inc.*, 135 P.3d 174, 188 (Kan. Ct. App. 2006). None of these cases is persuasive.

**{24}** We conclude the application of negligent entrustment of chattel to the sale of gasoline is consistent with the Restatement and the weight of authority concluding the same. We acknowledge "that the Restatement is merely persuasive authority entitled to

great weight that is not binding on this Court." *Gabaldon v. Erisa Mortg. Co.*, 1999-NMSC-039, ¶ 27, 128 N.M. 84, 990 P.2d 197. Regardless of whether this Court is considering limiting an existing duty or articulating a new duty, our analysis involves review and articulation of policy rationales for and against the imposition of that duty. *See Rodriguez*, 2014-NMSC-014, ¶¶ 1, 25 ("[C]ourts must articulate specific policy reasons, unrelated to foreseeability considerations, when deciding whether a defendant does or does not have a duty or that an existing duty should be limited.").

**{25}**   In our cases related to the negligent entrustment of automobiles, New Mexico courts have reviewed policy considerations, including the Legislature's policy to address driving while intoxicated, as "persuasive" in recognizing a negligent entrustment claim against entrustors who supply an automobile to someone the entrustor knew or had reason to know was incompetent. *See Sanchez*, 1997-NMCA-068, ¶¶ 12, 16-20; *Armenta*, 2015-NMCA-092, ¶¶ 14, 19, 25 (recognizing the claim for negligent entrustment of an automobile, but not reaching the issue of whether Defendant knew or should have known the entrustee was incompetent). There is a "general understanding that driving while intoxicated presents an unreasonable risk of physical harm to the driver and others," including the motoring public. *See Casebolt*, 829 P.2d at 358. This is especially so in New Mexico, which continues to have very high rates of drunk driving. KRQE, *New Mexico Ranks Among Worst States for Drunk Driving* (Dec. 16, 2019, updated May 24, 2021), https://www.krqe.com/news/new-mexico/new-mexico-ranks-among-worst-states-for-drunk-driving/ (last visited July 1, 2021); N.M. Dep't of Transp., *New Mexico DWI Report 2019*, https://gps.unm.edu/gps_assets/tru_data/Crash-Reports/DWI-Reports/2019-dwi-report.pdf (last visited July 1, 2021). In considering that risk to safety, New Mexico courts have recognized that entrustors owe a duty to refrain from voluntarily supplying a vehicle to an entrustee who is intoxicated. *Armenta*, 2015-NMCA-092, ¶ 19; *Sanchez*, 1997-NMCA-068, ¶ 20. The same logic supports a duty to refrain from supplying the gasoline for a vehicle to an entrustee who the entrustor knows or has reason to know is intoxicated.

**{26}**   The Court of Appeals in *Armenta*, 2015-NMCA-092, ¶¶ 16, 19, and *Sanchez*, 1997-NMCA-068, ¶ 23, relied on *Casebolt v. Cowan.* In *Casebolt*, the Colorado Supreme Court considered whether the owner of an automobile owed a duty to the borrower of that automobile to prevent injuries to the borrower resulting from the borrower's own intoxicated driving. 829 P.2d at 353. The Colorado Supreme Court concluded that this duty was encompassed in the doctrine of negligent entrustment of chattel due to the unreasonable risk of harm that driving while intoxicated poses to the driver and others. *Id.* at 358-61. However, before concluding that the automobile owner owed a duty to the borrower, the Colorado Supreme Court still reviewed policy rationales for and against imposing such a duty. *Id.* at 361-62 (weighing policy considerations regarding driving while intoxicated, risk of harm, and burden on entrustor).

**{27}**   In deciding whether to recognize that the duty to refrain from the negligent entrustment of gasoline is encompassed in the doctrine of negligent entrustment of chattel, we will similarly review policy considerations in favor and against applying that duty to the sale of gasoline to intoxicated drivers.

**B. Public Policy Considerations**

**{28}** A review of public policy involves a consideration of statutes, case law of New Mexico and other jurisdictions, and general principles of law. *Calkins*, 1990-NMSC-044, ¶ 8 ("[A] question of policy [is] determined with reference to legal precedent, statutes, and other principles comprising the law."); *Davis v. Bd. of Cnty. Comm'rs*, 1999-NMCA-110, ¶ 14, 127 N.M. 785, 987 P.2d 1172 ("For guidance on questions of policy, we look to general legal propositions we may infer from legal precedent within our own state and from other jurisdictions, and we look as well to any relevant statutes, learned articles, or other reliable indicators of community moral norms and policy views." (brackets omitted) (internal quotation marks and citation omitted)).

**1. New Mexico statutes**

**{29}** Because "it is the particular domain of the legislature, as the voice of the people, to make public policy," an analysis of these policy considerations begins with review of any relevant statutes. *Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609, 894 P.2d 386. Even though the Legislature has not yet imposed liability on gas stations that sell gasoline to intoxicated drivers, the Legislature clearly intends to limit intoxicated driving. As we have alluded, the Legislature has taken various steps to curtail intoxicated driving. Most directly, driving a vehicle while intoxicated is prohibited by criminal statute. NMSA 1978, § 66-8-102 (2016). Recently, the Legislature took additional steps to limit alcohol sales at gas stations, in particular. The Legislature prohibited the sale of hard alcohol in gas stations in McKinley County, where the sale in this case took place. H.B. 255, 55th Leg., 1st Special Sess. (N.M. 2021)*,* https://www.nmlegis.gov/Sessions/21%20Regular/final/HB0255.pdf (amending NMSA 1978, Section 60-6A-2 (1981)) (last visited July 1, 2021). The Legislature also amended the Liquor Control Act to prohibit most sales of "minis," which are related to both intoxicated driving and littering. *Id.* (enacting NMSA 1978, Section 60-3A-13 (2021)); Daniel J. Chacón, *New Liquor Law to Ban Most Mini Sales in New Mexico*, Santa Fe New Mexican, (Mar. 23, 2021, updated Mar. 24, 2021), https://www.santafenewmexican.com/news/local_news/new-liquor-law-to-ban-most-mini-sales-in-new-mexico/article_454d11d8-8bec-11eb-91e7-3797d461bcff.html (last visited July 1, 2021).

**{30}** In addition, the Liquor Control Act prohibits a person from selling, serving, or procuring alcohol for someone who that person knows or has reason to know is intoxicated. NMSA 1978, § 60-7A-16 (1993). Alcohol servers must also obtain training that includes education on state laws such as "driving under the influence of intoxicating liquor." NMSA 1978, § 60-6E-2(B)(2) (1999); *see* NMSA 1978, §§ 60-6E-4 (2000) to -5 (1999). The Legislature has provided for tort liability for sale or service of alcohol to an intoxicated person in violation of Section 60-7A-16. NMSA 1978, § 41-11-1 (1986) (Liquor Liability Act); *Delfino v. Griffo*, 2011-NMSC-015, ¶ 13, 150 N.M. 97, 257 P.3d 917 (explaining that social hosts, in addition to alcohol vendors, may be liable to third parties for harm caused by furnishing alcohol to an intoxicated individual). A suit against a licensee by an injured third party requires the third party to show it was "'reasonably apparent'" that the person being served or sold alcohol was intoxicated, which this Court

has equated with a showing of negligence. *Delfino*, 2011-NMSC-015, ¶ 13 (quoting §
41-11-1(A)(2)).

**{31}** There is no comparable statutory prohibition on the sale of gasoline to an
intoxicated person, which Defendant argues indicates that the Legislature intends not to
restrict such sales. Defendant argues that Sections 60-7A-16 and 41-11-1 indicate only
that the Legislature is concerned with sale of alcohol to the already-intoxicated.
Defendant contends that if the Legislature was also concerned with sale of gasoline to
intoxicated people, it could have specifically prohibited that sale as it prohibited the sale
of fireworks to intoxicated people. *See* NMSA 1978, § 60-2C-8(C) (2007). However, as
the Court recognized in *Rodriguez*, Plaintiff is not advancing a theory of negligence per
se, and the lack of a specific statutory section prohibiting the sale of gasoline to
intoxicated drivers is not dispositive. 2014-NMSC-014, ¶ 17.

> Full compliance with codes, laws, or ordinances that are silent with
> respect to the relevant issue—the need for protective devices to minimize
> risk from vehicle-building collisions—cannot dictate whether the duty of
> ordinary care should be modified. The only conclusion that can be drawn
> from such silence is that the legislative branches of local or state
> government have simply not addressed the issue.

*Id.* Indeed, New Mexico courts have recognized liability for negligent entrustment of a
vehicle to an intoxicated driver, even though there is no statute specifically prohibiting
such conduct. *See, e.g.*, *Armenta*, 2015-NMCA-092, ¶¶ 14, 19; *Sanchez*, 1997-NMCA-
068, ¶¶ 18-20.

**{32}** When recognizing that a person who entrusts a vehicle to an intoxicated person
may be liable for resulting injuries to that intoxicated person, in addition to injuries to a
third party, the Court of Appeals found Section 41-11-1 persuasive, although it
recognized that Section 41-11-1, generally, "[did] not govern the situation before [it]."
*Sanchez*, 1997-NMCA-068, ¶¶ 17-20. In *Sanchez*, the Court of Appeals noted that
Section 41-11-1(B) allows a person injured by his or her own intoxication to recover
from the licensee who sold that person alcohol in violation of Section 60-7A-16. 1997-
NMCA-068, ¶ 16. The Court of Appeals in *Sanchez* recognized that Section 41-11-1(B)
did not independently prohibit the negligent entrustment of vehicles but concluded that
the statute reflected a societal attitude in favor of allowing suits "by intoxicated persons
against those who were in a position to prevent them from engaging in self-destructive
conduct." *Id.* ¶ 19. Based on Section 41-11-1(B) and the policy expressed therein, the
Court of Appeals concluded that "if the entrustor acts with gross negligence . . . [,] one
who entrusts a motor vehicle to an intoxicated person may be liable to the entrustee."
*Id.* ¶ 20; *see also Armenta*, 2015-NMCA-092, ¶ 19 (extending the liability identified in
*Sanchez* to cases of simple negligent entrustment).

**{33}** Additionally, the Legislature's willingness to hold a licensee who sells alcohol to
an intoxicated person liable for injuries to third parties caused by that intoxicated person
reflects a policy that liability for injuries caused by drunk driving should extend further
than those eligible as injured claimants. *See* § 41-11-1(A). A duty not to sell gasoline to

an intoxicated person is consistent with liability for providing an intoxicated person with alcohol or a vehicle. Gasoline, alcohol, and the vehicle itself are all enabling instrumentalities involved in intoxicated driving. Gasoline is required to operate most vehicles today. Providing gasoline to an intoxicated driver is like providing car keys to an intoxicated driver. Accordingly, liability under negligent entrustment for the sale of gasoline to an intoxicated driver is consistent with New Mexico law.

## 2.    Case law of other jurisdictions

**{34}**    We next turn to the consideration of out-of-state cases for guidance. Plaintiff directs us to two states, California and Tennessee, which have considered the application of negligent entrustment of chattel to the sale of gasoline to an intoxicated driver. *Fuller v. Standard Stations, Inc.*, 58 Cal. Rptr. 792 (1967); *O'Toole v. Carlsbad Shell Serv. Station*, 247 Cal. Rptr. 663 (Cal. App. 1988); *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545 (Tenn. 2005).

**{35}**    In the 1960s, the California Court of Appeal declined to impose a duty to refrain from selling gasoline to an intoxicated driver. *Fuller*, 58 Cal. Rptr. at 794-95, 797. The court in *Fuller* based its decision on an earlier California case, *Fleckner v. Dionne*, 210 P.2d 530 (Cal. Ct. App. 1949), and denied liability for the sale of alcohol to a "known inebriate" who then injured a third party in an automobile collision, exonerating the seller of alcohol as well as the seller of gasoline. *Id.* at 794-97. The court also noted that under California tort law the driver's intoxication, rather than the sale of alcohol, was considered the proximate cause of the injury. *Id.* at 793-94, 796 n.3. *Fuller* was premised largely on the lack of liability for the sale of alcohol to an intoxicated person, which is not the law in New Mexico. Section 41-11-1. Later, the court in *O'Toole* disagreed with *Fuller* and held that a gas station could be liable for injuries caused by an intoxicated driver to whom the gas station had sold gasoline. *O'Toole*, 247 Cal. Rptr. at 671. The analysis in *O'Toole* relied in part on California's adoption of negligent entrustment of chattel found in Section 390 of the Restatement. *Id.* at 669. While the gas station had not entrusted the car to the intoxicated driver, the court concluded that it had entrusted the driver with gasoline, thereby providing her with "motive power for the car." *Id. O'Toole* provides an example of the rationale for applying negligent entrustment of chattel to the sale of gasoline, but its persuasive value is limited by the fact that the California Supreme Court ordered that it not be officially published, and it is therefore not the law of California. *Id.* at 663.

**{36}**    In a published opinion, the Tennessee Supreme Court squarely addressed the question of whether a gas station owes a duty to third parties using the roadway to refrain from selling gasoline to an intoxicated driver or assisting that intoxicated driver in pumping gasoline. *West*, 172 S.W.3d at 547. The Tennessee Supreme Court concluded that selling gasoline to an intoxicated driver "provid[es] mobility to a drunk driver which he otherwise would not have had, thus creating a risk to persons on the roadways." *Id.* at 551. The court also drew a parallel between selling gasoline to an intoxicated driver and selling alcohol to an intoxicated driver, which was prohibited by state law and store policy. *See id.* at 552. Relying on the duty to act reasonably under the circumstances, the court held "that a convenience store employee owes a duty of reasonable care to

persons on the roadways . . . not to sell gasoline to a person whom the employee knows (or reasonably ought to know) to be intoxicated and to be the driver of the motor vehicle." *Id.* Finally, the court acknowledged that the doctrine of negligent entrustment of chattel entailed the same duty as the plaintiffs' general negligence claim, as expressed in Section 390 of the Restatement. *Id.* at 553-56. We find the holding and reasoning in *West* persuasive, as it demonstrates that liability for the sale of gasoline to an intoxicated driver is a straightforward application of the doctrine of negligent entrustment of chattel.

### 3. General principles of law

**{37}** Finally, we consider the policy rationales for and against a particular duty found in the general principles of law. *Calkins*, 1990-NMSC-044, ¶ 8. It has been established in this jurisdiction and others that included among the purposes of tort law is adequate compensation for the injured party and deterrence of the tortfeasors. *See Beavers v. Johnson Controls World Servs., Inc.*, 1994-NMSC-094, ¶ 30, 118 N.M. 391, 881 P.2d 1376 (concluding that the purposes of tort law "are compensation of the [injured third party] and deterrence of the tortfeasor"). Concerning compensation, if the intoxicated driver is unable to compensate fully the injured third party, imposing liability on the gas station that sold gasoline to that intoxicated driver shifts the costs of the accident from the injured third party to a party who helped create the risk of injury. Recent Case, *Negligence—Service Station Liability—Service Station Held Liable for Drunk Driving Accidents.—O'Toole v. Carlsbad Shell Service Station, 247 Cal. Rptr. 663 (Ct. App. 1988)*, 102 Harv. L. Rev. 544, 547 (1988) (hereinafter Recent Case). It is reasonable to assume that gas stations would likely incorporate the costs of this liability into the price of gasoline, thereby spreading the cost of injuries caused by intoxicated driving to the entire class of individuals at risk of injury. *Id.*; *see also Blake v. Pub. Serv. Co. of N.M.*, 2004-NMCA-002, ¶ 21, 134 N.M. 789, 82 P.3d 960 ("The capacity to bear or distribute loss is a factor to consider in allocating the risk." (internal quotation marks and citation omitted)). Concerning deterrence, absent any liability for injuries resulting from the sale of gasoline to intoxicated drivers, gas stations have an economic incentive to sell to all willing purchasers, even if doing so puts others at risk. *See* Recent Case, *supra*, at 547-48.

**{38}** Based on these considerations, we conclude that the sale of gasoline is not precluded by other policy considerations from the doctrine of negligent entrustment of chattel as recognized in New Mexico. Vendors of gasoline have a duty to refrain from supplying gasoline to a driver the vendor knows or has reason to know is intoxicated. This is consistent with Section 390 of the Restatement and with the articulation by New Mexico courts of the requirements of negligent entrustment of chattel. *Armenta*, 2015-NMCA-092, ¶ 12. The Legislature has clearly imposed policy that seeks to limit the risk posed by intoxicated driving. Our own courts have interpreted those legislative enactments to extend that liability to those who provide vehicles to people the entrustors know or have reason to know are intoxicated. *See id.*

**{39}** We see no meaningful difference under the doctrine of negligent entrustment of chattel between a duty not to give an intoxicated person the keys to a vehicle and a duty

to refrain from giving an intoxicated person gasoline to drive that vehicle. Both instrumentalities enable driving while intoxicated, which creates an unreasonable risk of harm to the driver and the motoring public. *See Casebolt*, 829 P.2d at 358 ("[D]riving while intoxicated presents an unreasonable risk of physical harm to the driver and others."); *Sanchez*, 1997-NMCA-068, ¶ 19 ("[Section 41-11-1(B)] reflects a societal attitude about suits by intoxicated persons against those who were in a position to prevent them from engaging in self-destructive conduct."); Restatement § 390. There is no question here about what the Court of Appeals called in *Gabaldon*, "*highly dangerous* potentialities involving a substantial danger or risk to the general public," that we later rejected. 1999-NMSC-039 ¶¶ 32, 35 (internal quotation marks and citation omitted) (rejecting the Court of Appeals determination that wave pools posed "highly dangerous potentialities," in part because the Court of Appeals' classification of wave pools as dangerous was inconsistent). Additionally, not selling gasoline to a driver when the vendor knows or has reason to know that driver is intoxicated is entirely feasible. *See West*, 172 S.W.3d at 552 ("A safer alternative [is] readily available and easily feasible—simply refusing to sell gasoline to an obviously intoxicated driver.").

{40}     Defendant expresses concern that Plaintiff's position would "'unwittingly impose unreasonable and uncertain duties'" on potential tortfeasors, a concern echoed by this Court in the past. *See Gabaldon*, 1999-NMSC-039, ¶¶ 35-37 (quoting Robert M. Howard, Note, *The Negligent Commercial Transaction Tort: Imposing Common Law Liability on Merchants for Sales and Leases to 'Defective' Customers*, 1988 Duke L.J. 755, 758). In Plaintiffs' appeal of the district court's dismissal of their claims against the property owner, the Court of Appeals in *Gabaldon* created a new duty by applying the doctrine of negligent entrustment to real property to determine that the landlord of a property designed to be used as a water park had a duty of ordinary care when selecting a tenant, which included investigating what "knowledge and experience potential tenants had in management of wave pools." 1997-NMCA-120, ¶¶ 44-45, 124 N.M. 296, 949 P.2d 1193. We reversed the Court of Appeals which had held that "a landlord owes a duty of care in selecting a competent lessee or concessionaire when the landlord is in effect requiring, or allowing, another to undertake an activity . . . for the landlord's economic benefit" and when the property is designed for a particular purpose which the lessor may foresee as involving "highly dangerous potentialities involving a substantial risk to the general public." *Gabaldon*, 1999-NMSC-039, ¶¶ 22-24 (omission in original) (brackets omitted) (internal quotation marks and citation omitted). But "[we did] not disagree in principle with the establishment of such a new cause of action." *Id.* ¶ 24.

{41}     Instead, we rejected the Court of Appeals' holding because we were concerned that the Court of Appeals created a duty that did "not provide sufficient demarcations" for lessors to investigate possible lessees, leaving lessors uncertain of their duties and potential liabilities when engaging in lease transactions. *Id.* ¶ 35 ("The Court of Appeals' proposed rule provides little guidance as to exactly when and how the duty to investigate a lessee's capacity to safely operate the leased premises should be invoked."). We concluded that this uncertainty in the law would unreasonably affect the "free flow of commerce." *Id.* ¶ 37.

**{42}** A duty must be clear and reasonable, allowing potential tortfeasors to know how they must conduct themselves to avoid liability. *See id.*; *Chavez v. Desert Eagle Distrib. Co. of N.M.*, 2007-NMCA-018, ¶ 29, 141 N.M. 116, 151 P.3d 77 (holding that alcohol distributors were not liable for third parties' injuries when the casino conformed with local laws and ordinances and the distributors' sales were lawful because requiring the distributors to look beyond the otherwise lawful sales would "'impose unreasonable and uncertain duties' on wholesalers" (quoting *Gabaldon*, 1999-NMSC-039, ¶ 37)) *overruled on other grounds by Rodriguez*, 2014-NMSC-014, ¶¶ 8-10. The concerns that contributed to our rejection of the application of the doctrine of negligent entrustment to real property in *Gabaldon* are limited here. The circumstances to which and people to whom the duty described here applies are clear, the duty is practicable, and a vendor's duty to investigate is naturally limited. Vendors will be able "to conform their conduct in a manner that [will] reasonably assure them that they [will] be insulated from liability when" selling gasoline. *Gabaldon*, 1999-NMSC-039, ¶ 36. These specific guidelines will also avoid "a chilling effect on the free flow of commerce" with which we were concerned in *Gabaldon*. *Id.* ¶ 37.

**{43}** We do not share Defendant's or the dissent's concern regarding the duty to investigate. *See Vic Potamkin Chevrolet, Inc. v. Horne*, 505 So. 2d 560, 563 (Fla. Dist. Ct. App. 1987). The circumstances related to the duty to refrain from selling gasoline to an intoxicated driver are unlike the circumstances in both *Gabaldon* and *Desert Eagle*, where we were concerned with imposing duties to investigate conditions that were not readily apparent to the vendor. *Gabaldon*, 1999-NMSC-039, ¶ 34 ("[I]n the context of chattel entrustments, ordinary care has not required a duty to investigate."); *Desert Eagle*, 2007-NMCA-018, ¶ 29 (declining to impose liability on alcohol distributors "where there is no indication that the establishment is not acting in conformity with applicable laws and ordinances").

**{44}** Plaintiff readily concedes that the duty here requires that a gasoline vendor must have an opportunity to identify a driver as "so intoxicated as to pose a danger to the motoring public." Given the opportunity to observe a customer, a gasoline vendor may reasonably be expected to know or have reason to know that a customer is so intoxicated as to pose a danger to the motoring public, even absent any training or equipment. It is well accepted that a layperson may testify to whether a person was intoxicated so long as the layperson had an opportunity to observe that person. *See State v. Privett*, 1986-NMSC-025, ¶ 20, 104 N.M. 79, 717 P.2d 55 ("[I]t is well recognized that laymen are capable of assessing the effects of intoxication as a matter within their common knowledge and experience."); 6 Clifford S. Fishman, *Jones on Evidence* § 40:41, *Alcohol intoxication*, at 189 (7th ed. 2016) ("There is a clear consensus that a lay witness may testify as to whether *X* was intoxicated on the occasion in question, so long as the witness first establishes that he or she had an adequate opportunity to observe *X's* behavior on that occasion." (footnote omitted)). The ability of people to identify those who are intoxicated is bolstered by the fact that here Defendant required its gas station employees to be trained to identify intoxicated customers and allowed them to refuse sales to individuals who were intoxicated. *Cf. West*, 172 S.W.3d at 552 (noting that the gas station and state law prohibited alcohol

sales to "intoxicated persons" and that the clerk knew "she was never required to allow a customer to purchase any item, including gasoline").

{45} It is much more apparent to the average person whether someone is too intoxicated to drive safely than whether that person is an incompetent driver, as in *Horne*, 505 So. 2d at 561, or a distracted driver, as in Defendant's various examples involving cellphones and fast food. Unlike the seller in *Horne*, who would have no reasonable way to determine a buyer's competency to drive without engaging in some sort of investigation, routine observation of a customer without any investigation would allow a gasoline vendor to know or have reason to know that the customer is intoxicated. *See Vic Potamkin Chevrolet, Inc.*, 533 So. 2d at 263. In fact, the vendor would become aware of the purchaser's intoxication "as an incidental by-product of the normal sales routine." *Id.* at 262.

{46} We recognize concerns such as a gas station employee's ability to view the purchaser at the pump or uncertainty regarding whether the intoxicated purchaser is in fact the driver rather than the passenger. *West*, 172 S.W.3d at 552. Similarly, we recognize that many gasoline purchases occur at unattended gas stations where an intoxicated purchaser might not interact with a person who can observe the purchaser's intoxication. These types of concerns, however, do not relate to whether a duty exists as a matter of policy. Rather, these types of concerns are better described as questions of foreseeability and breach which are left for the jury in individual cases. *See Rodriguez*, 2014-NMSC-014, ¶¶ 4, 9 ("Foreseeability considerations should not be used by a judge to determine the scope of duty, because not even the most experienced judge is capable of anticipating all possible facts that might affect future foreseeability determinations in similar cases."). Specifically, these concerns relate to questions of fact regarding whether the vendor knew or had reason to know that an entrustee was so intoxicated as to pose a danger to the motoring public. *West*, 172 S.W.3d at 552 ("It is a question of fact for a jury as to what the employee knew with respect to the individual's intoxication and status as driver.").

## III.    CONCLUSION

{47} Based on the foregoing discussion and policy considerations, we conclude that under New Mexico law and the doctrine of negligent entrustment of chattel, a commercial gasoline vendor owes to a third party using the roadway a duty of care to refrain from selling gasoline to a driver the vendor knows or has reason to know is intoxicated.

{48}  **IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**DAVID K. THOMSON, Justice**

**BARBARA J. VIGIL, Justice, retired, dissenting**
**Sitting by designation**

**VIGIL, Justice, retired, sitting by designation (dissenting).**

**{49}**     Until today, our courts have only recognized negligent entrustment in the context of a bailment. For the first time, the majority now extends the doctrine to a commercial transaction: the retail sale of gasoline, a nondefective, ordinary good. This sea change in the law could have far-reaching consequences for retail businesses, and I cannot concur with this change for three reasons.

**{50}**     First, our own cases and many other jurisdictions do not apply negligent entrustment to commercial transactions. I believe that choice represents sound public policy because the regulation of commercial transactions is a quintessential legislative function. Statutes and regulations should neutrally govern business transactions, rather than judicially created common law duties that leave individual merchants to decide whether a customer is unfit to use a product on a case-by-case basis. Such ad hoc decision-making on the part of merchants leads to overcautiousness, potential error, and claims of discrimination. As a matter of general principle, I would categorically exclude commercial transactions from the doctrine of negligent entrustment.

**{51}**     Second, the public policy of New Mexico does not call for encumbering vendors of nonalcoholic chattel with a duty not to sell in order to prevent DWI. While the sale and service of alcohol is regulated, neither our common law nor our statutes warrant extending liability for DWI to retail sales of nonalcoholic goods. In fact, our dramshop statute narrows, rather than expands, alcohol servers' common law third-party liability for an intoxicated person's torts. The Legislature has not approved blanket liability for all third-party contributors to DWI as the majority suggests.

**{52}**     Third, the duty is unclear. The majority creates a sweeping new duty based on atypical facts—gasoline purchased from an attendant—then fails to address how this rule is to be applied in the typical scenario when gasoline is purchased at the pump. It is unclear whether erratic behavior observed through a window gives rise to a duty to investigate, for example, and the majority provides no guidance as to how that investigation should occur. The majority dismisses concerns about investigation by holding that none will be needed because intoxication is obvious. But the majority does not consider the practical reality of sales to the general public, which involve brief interactions with all and sundry. Customers may exhibit unusual behavior for any number of reasons, and the majority gives no guidance as to what investigation is needed when a gas station attendant simply does not know why a customer is behaving unusually. The majority also dismisses, as irrelevant to duty, the question of gasoline sales to nondrivers. However, the duty not to sell only arises if an intoxicated customer intends to use the gasoline to drive, which leads to a duty to investigate in those cases when, for example, a customer wants to fill a gasoline canister and the intended use of the gasoline is unknown. Again, the majority provides no guidance as to how that

investigation should be conducted. Finally, under the majority's reasoning, vendors of any item that enables DWI—not only gasoline—could now be liable for a customer's DWI-related torts. Thus auto parts stores, tire shops, mechanics, and others will be left guessing as to whether they are subject to the new duty and, if so, how to behave so as to avoid liability.

**{53}**     These concerns underscore the basic problems with judicial intervention in ordinary business transactions. Because judicial rulings in this area can have far-reaching unintended consequences, business transactions should be regulated by the Legislature. The Legislature is in the best position to consider the full breadth of societal interests, including public safety and the flow of commerce, when crafting legislation. In the absence of legislation, we should not impose liability on a merchant for transacting ordinary business. Because the majority holds otherwise, I respectfully dissent.

## I.     WE HAVE NEVER APPLIED THE TORT OF NEGLIGENT ENTRUSTMENT OF CHATTEL TO A COMMERCIAL TRANSACTION AND IN DOING SO NOW, THE MAJORITY IMPOSES A RESTRAINT ON TRADE

**{54}**     Our case law on negligent entrustment is sparse indeed, but one constant through-line is that negligent entrustment has been applied only to bailments. While I agree with the majority that "New Mexico courts have recognized that entrustors owe a duty to refrain from voluntarily supplying a vehicle to an entrustee who is intoxicated," maj. op. ¶ 23, that principle was developed exclusively in the context of a vehicle owner giving another person permission to use *the owner's* car. Specifically, the only successful claims of negligent entrustment of a vehicle involved employees using company vehicles. *Armenta*, 2015-NMCA-092, ¶¶ 2-3 (involving an employee on a company's "do not drive" list using a company vehicle); *Sanchez*, 1997-NMCA-068, ¶ 1 (involving an intoxicated employee using a company cement truck); *McCarson*, 1984-NMCA-129, ¶¶ 2, 6, 17 (involving an employee with history of substance abuse using a company vehicle); *DeMatteo*, 1991-NMCA-027, ¶ 6 (involving an employee with a history of poor driving using a company vehicle).[5] None of these cases involved an allegedly negligent sale.

**{55}**     Although the parties did not raise this argument, it is of fundamental importance that the duty we have previously recognized in negligent entrustment of chattel is only the duty of a business not to allow an unfit employee to use a company vehicle. Our courts have not held businesses liable under a negligent entrustment theory for other types of business transactions. *See, e.g.*, *Gabaldon*, 1999-NMSC-039, ¶ 1 (no landlord liability for negligently entrusting real property to lessees); *Shea v. H.S. Pickrell Co., Inc.*, 1987-NMCA-149, ¶¶ 1, 4-5, 106 N.M. 683, 748 P.2d 980 (no mortgage lender liability for negligently entrusting mortgagee's funds); *Spencer v. Gamboa*, 1985-NMCA-033, ¶¶ 1, 8, 102 N.M. 692, 699 P.2d 623 (no car dealership liability for negligently

---

5In line with these cases, our uniform jury instruction on negligent entrustment of an automobile does not contemplate the sale of an automobile, but rather its bailment. *See* UJI 13-1646. Under UJI 13-1646, negligent entrustment of a motor vehicle is recognized as "the claim of negligence in allowing" a person to use or drive "[the defendant's] motor vehicle," and it must be proven that the defendant "was the owner or person in control of the vehicle that caused [the plaintiff's] injuries." *Id.*

entrusting a car to a customer for a test drive). Other than in the special context of alcohol sales, we have never held that a business has a duty not to sell to a certain type of customer.

**{56}** The majority now expands negligent entrustment into the tort of negligent commercial transaction. *See generally* Robert M. Howard, Note, *The Negligent Commercial Transaction Tort: Imposing Common Law Liability on Merchants for Sales and Leases to 'Defective' Customers*, 1988 Duke L.J. 755 (1988) (coining the phrase "negligent commercial transaction" to apply to negligent entrustment of chattel in the context of the sale of nondefective goods to an incompetent customer). The danger inherent in this expansion is that, "in the course of compensating plaintiffs, courts can unwittingly impose unreasonable and uncertain duties on industries." *Id.* at 758. Under the theory of negligent commercial transactions, merchants have a duty not to sell to unfit customers, which "effectively require[s] independent investigation to establish each buyer's fitness to use each product." *Gabaldon*, 1999-NMSC-039, ¶ 37. It is "manifestly unreasonable" to place that duty on merchants, *id.*, for two readily apparent reasons.

**{57}** First, it opens the door to invidious discrimination, actual or perceived. "[W]e may not want individual merchants to decide which customer characteristics justify refusing to sell" a product to a customer under the guise of safety, because it affords the merchant too much discretion. Bernard W. Bell, *The Wide World of Torts: Reviewing Franklin & Rabin's Tort Law and Alternatives*, 25 Seattle U.L. Rev. 1, 26 (2001). "We might instead prefer that the government, rather than individual merchants, assess a person's qualifications. If government officials are charged with making such decisions, at least we can ensure that they make such decisions openly and without private motives." *Id.* If merchants must assess a customer's fitness before making a sale, they will consider each customer's individual characteristics—many of which are protected by our antidiscrimination laws. *See, e.g.*, NMSA 1978, § 28-1-7(F) (2020) (providing that no merchant may discriminate against a customer based on "race, religion, color, national origin, ancestry, sex, sexual orientation, gender identity, pregnancy, childbirth or condition related to pregnancy or childbirth, spousal affiliation or physical or mental handicap"). In some cases, the merchant may believe that a customer's protected characteristic is the very reason that sale should be denied. Thus, for example, "the person with a history of epilepsy may not be able to obtain necessary goods and services because of a merchant['s] concern about potential liability should their epileptic customer suffer a seizure and harm someone else." Bell, *supra*, at 26. In other cases, a merchant might use the duty not to sell as pretextual justification for discriminatory practices that are actually based on the merchant's animus. *Cf.* Katherine Cook, *'It never feels good': Black man sues gas station after attendant refuses to sell him gas, suspecting it's for protest fires*, 13newsnow, 2:26 pm Oct. 16, 2020, https://www.13newsnow.com/article/news/local/protests/black-man-sues-gas-station-after-attendant-refuses-to-sell-him-gas-suspecting-its-for-protest-fires/283-19f856a7-aa4b-4f66-a7f5-0b60ccf229bd (reporting that a gas station refused to sell gasoline in a container to a Black customer because the attendant assumed the customer would use it for arson) (last visited July 1, 2021). In either scenario, the potential for discriminatory practices would stem from the same source: negligent commercial transaction liability that imposes on merchants a duty to assess customers' fitness on an individual basis.

**{58}** Second, it is facially unreasonable to ask a merchant to assess a customer's fitness to use a product safely because merchants and customers are usually strangers. It is difficult at best to assess a stranger's ability to use a product safely, and it is a totally different task than ensuring the product itself is free of defects. There is no natural limit on how much investigation is enough. Even after investigation, a merchant may not feel sure that a customer is fit to use a product. A prudent vendor might simply err on the side of caution and deny sales in marginal cases, thereby forgoing profits and harming business. *See Gabaldon*, 1999-NMSC-039, 37). ("The imposition of [a] new duty not to sell would . . . retard the free flow of commerce." (internal quotation marks and citation omitted)).

**{59}** Perhaps these difficulties have led to the relative scarcity of cases adopting the tort of negligent commercial transaction, with even fewer applying the tort to the sale of gasoline. Nationwide, only two cases have done so: *O'Toole* and *West*. Maj. op. ¶¶ 32-33. *O'Toole* is an unpublished California case, which, as the majority points out, is of limited value because it is not law. Maj. op. ¶ 32. *West* is the law of Tennessee, but that is the only jurisdiction that imposes liability on gas stations for a customer's DWI-related tort.

**{60}** In contrast, many jurisdictions have explicitly adopted a bailment-only view of negligent entrustment and declined to extend the tort to commercial transactions. In Texas, for example, "liability for negligently entrusting [chattel] . . . is a part of the law of bailments, but not of the law of sales or gifts." *Rush v. Smitherman*, 294 S.W.2d 873, 876 (Tex. App. 1956). The *Rush* Court looked to the plain meaning of entrustment to arrive at this result. "A bailor entrusts, for what he entrusts is his. But a vendor does not entrust; he sells his chattel." *Id.*

**{61}** Alabama, Florida, Kansas, and Michigan have interpreted negligent entrustment in the same way. *See Thompson v. Mindis Metals, Inc.*, 692 So. 2d 805, 807 (Ala. 1997) ("To 'entrust' property to another, as opposed to transferring it permanently, one must retain either ownership of the property or dominion and control over it. If a party transfers ownership of property to the buyer or donee and relinquishes control or dominion over the property, there is no entrustment. . . . negligent or otherwise." (brackets, ellipses, internal quotation marks and citations omitted)); *Vic Potamkin Chevrolet*, 505 So. 2d at 561, 562 ("A seller cannot be held liable for harm caused by a 'defective' customer."); *Estate of Pemberton v. John's Sports Ctr., Inc.*, 135 P.3d 174, 187-88 (Kan. Ct. App. 2006) ("Kansas has historically applied negligent entrustment principles to situations where an owner of a chattel has loaned [the chattel]. . . . Kansas has never applied the negligent entrustment doctrine in the context of the *sales* of chattels."); *Buczkowski v. McKay*, 490 N.W.2d 330, 331 (Mich. 1992) (similar).

**{62}** Our own jurisprudence is aligned with these sister states rather than *West*. Historically, our courts have only applied negligent entrustment to bailments. And when we have had occasion to consider negligent entrustment in the commercial context, we expressly declined to extend the doctrine that far. In *Gabaldon*, we declined to extend negligent entrustment to commercial leases in part because imposing a "duty not to sell would create uncertainty and retard the free flow of commerce." 1999-NMSC-039, ¶ 37

(quoting *Vic Potamkin Chevrolet*, 505 So. 2d at 563). Although that case involved commercial leases rather than commercial sales, *Gabaldon*'s reasoning relied on cases drawing the distinction between bailments and sales: "the creation of a duty on the part of the seller to guarantee the acts of a buyer, would effectively require independent investigation to establish each buyer's fitness to use each product, and would be manifestly unreasonable." *Id.* (brackets, internal quotation marks, and citation omitted). Thus *Gabaldon*'s analysis in refusing to extend negligent entrustment to commercial leases applies with equal force to commercial sales. In harmony with our own precedent, and to avoid business uncertainty, I would follow the example of Texas and other states that explicitly restrict negligent entrustment to bailments rather than sales.

**{63}**     Finally, I acknowledge the majority's position that under Section 390 of the Restatement (Second) of Torts, vendors as well as bailors can be liable for negligent entrustment. Maj. op. ¶ 22.[6] However, as the majority also acknowledges, "the Restatement is merely persuasive authority . . . that is not binding on this Court." Maj. op. ¶ 24 (quoting *Gabaldon*, 1999-NMSC-039, ¶ 27); *see also Proctor v. Waxler*, 1972-NMSC-057, ¶ 12, 84 N.M. 361, 503 P.2d 644 ("The Restatement of the Law of Torts . . . is not to be considered as precedent that this Court is bound to follow at all times."). To the extent that the majority implies that Section 390 of the Restatement (Second) of Torts has become binding precedent through our decisional law, I disagree. Maj. op. ¶ 22 (stating that "this Court . . . previously adopted, without limitation, the doctrine of negligent entrustment described by the Restatement"). Even granting that the general definition of negligent entrustment in Section 308 has been incorporated into our case law, the only two cases to discuss Section 390 of the Restatement, *Armenta* and *Sanchez*, did not "adopt" that section "without limitation." *Armenta* cited Section 390 for the unremarkable proposition that its "central feature" was "the act of entrustment, or permission, to use [a] vehicle." 2015-NMCA-092, ¶ 12. *Sanchez* cited Section 390 as persuasive authority in a hypothetical discussion of culpability that ultimately the Court did not resolve. 1997-NMCA-068, ¶¶ 21-24 (discussing, inter alia, Section 390 and concluding, "We leave resolution of this issue to another day"). Neither of these cases adopted Section 390 "without limitation," and neither is binding precedent on this Court. Because the vendor/bailor distinction has never been at issue in any New Mexico case—a fact the majority does not contest—we simply do not have precedent in that area. "Our jurisprudence firmly establishes that cases are not authority for propositions not considered." *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 39, 135 N.M. 397, 89 P.3d 69 (Fry, J., dissenting) (internal quotation marks and citation omitted). Therefore, we must rely on principles alone. For the reasons given above—and Section 390 of the

---

6The relevant sections of the Restatement (Second) of Torts have been superseded by the Restatement (Third) of Torts. *See* Restatement (Third) of Torts: Phys. & Emot. Harm Intro. (2010) ("[T]hese three installments replace and supersede Divisions 2 and 3 of the Restatement Second of Torts"); *see also Alcombrack v. Ciccarelli*, 363 P.3d 698, 704 (Ariz. Ct. App. 2015) (recognizing the replacement and supersession). Under the Restatement (Third), the doctrine of negligent entrustment is no longer treated as a stand-alone doctrine but has been absorbed into the broad category, "Conduct That Is Negligent Because of the Prospect of Improper Conduct by the Plaintiff or a Third Party." Restatement (Third) of Torts: Phys & Emot. Harm, § 19. I see no reason why the Second Restatement, written over fifty years ago, should play a predominant role in resolving novel issues of tort law in New Mexico given that the Third Restatement supplanted it.

Second Restatement notwithstanding—I apply the principles of judicial restraint, the prevention of invidious discrimination, and the promotion of certainty in business to reach the conclusion that negligent entrustment of chattel should not be extended to commercial transactions.

## II. NEW MEXICO'S PUBLIC POLICY AGAINST DWI DOES NOT SUPPORT EXTENDING LIABILITY FOR DWI-RELATED HARMS TO VENDORS OF NONALCOHOLIC GOODS

{64}    When this Court examines public policy to find a source for a new duty, it should primarily rely on legislative enactments for the simple reason that the Legislature directly responds to the public will. "[I]t is the particular domain of the legislature, as the voice of the people, to make public policy." *Torres*, 1995-NMSC-025, ¶ 10. In contrast, the judiciary "is not as directly and politically responsible to the people." *Id.* Therefore, "[s]tatutes, enacted by persons elected to represent the public will, may be a more reliable source of information concerning community norms and policy" than case law. *Sanchez*, 1997-NMCA-068, ¶ 15. Judicially created policies should be narrowly tailored. "Legislation often represents a compromise between conflicting policies; for a court to select one of those policies as legislative policy and extend that policy beyond the limits of the statute may do violence to the legislative compromise." *Id.* ¶ 18.

{65}    Importantly, our Legislature has not prohibited or limited the sale of gasoline in any manner. As the federal district court pointed out earlier in this litigation, "[Defendant's] sale of gasoline to Mr. Denny violated *no* law." *Morris v. Giant Four Corners, Inc.*, 378 F. Supp. 3d 1040, 1054 (D.N.M. 2019). The majority also acknowledges that no statute prohibited this sale. Maj. op. ¶ 28. In my view, the absence of a prohibitory or regulatory statute is a prima facie indication that the policy of this state is that gasoline may be sold to anyone. *Cf. Buczkowski*, 490 N.W.2d at 331 (holding "because the Legislature has not defined a class of purchasers who we may deem legally incompetent to buy ammunition, we find that the retailer did not have a legal duty" not to sell it). While I accept my colleagues' position that legislative silence is not dispositive, I do not agree that it bears no meaning at all.

{66}    In the absence of a prohibitory statute, the majority relies on statutes unrelated to the sale of gasoline to deduce a general legislative "policy that liability for injuries caused by drunk driving should extend further than those eligible as injured claimants." Maj. op. ¶ 30. The statutes cited by the majority cover three areas of legislation: the criminalization of DWI under Section 66-8-102; the regulation of alcohol sales and service under Section 60-7A-16 and Sections 60-6E-2 to -5; and the regulation of civil liability for overservice of alcohol under Section 41-11-1. Maj. op. ¶ 27. These statutes do not support third-party liability for gasoline sales.

**A. This Court Created Common Law Dramshop Liability in Express Reliance on a Statute Prohibiting the Sale of Alcohol to Intoxicated Persons; There Is No Comparable Statute Prohibiting the Sale of Gasoline**

**{67}**    At common law, those who sold alcohol were not liable for damages caused by those who purchased the alcohol.  "At common law, it was not a tort to either sell or give intoxicating liquor . . . . [and] the common law impose[d] no liability on the seller of intoxicating liquor[] for damages that resulted from the intoxication of a patron either on the theory of a direct wrong or negligence." *Lopez v. Maez*, 1982-NMSC-103, ¶ 5, 98 N.M. 625, 651 P.2d 1269. Until our opinion in *Lopez*, the common law rule was the law in New Mexico. *Id.* ¶¶ 1, 4.

**{68}**    In *Lopez*, we modified the common law and recognized dramshop liability for the first time. We held that tavernkeepers could be liable for the torts of intoxicated customers because they had a statutory duty not to sell alcohol to "any habitual drunkard or person of unsound mind," and a regulatory duty to refuse the sale of alcohol "to any person who is obviously intoxicated." *Id.* ¶¶ 12-14. The *Lopez* Court expressly relied on these laws to establish the duty that would serve as the basis for a new, judicially created cause of action in negligence against tavernkeepers. *See id.* ¶ 10 ("When a tavernkeeper sells liquor to an intoxicated patron *in violation of a statute that forbids such,* he then becomes responsible for the foreseeable harm to others caused by the actions of that patron." (emphasis added)); *id.* ¶ 16 (similar).

**{69}**    By grounding the common law duty in a legislative prohibition, *Lopez* followed a prudent course. In this case, the majority cannot similarly ground the duty in a violation of statute or regulation and therefore departs from the more restrained analysis we employed in *Lopez.* I would follow the precedent set in *Lopez* and would not impose liability on a merchant for conducting ordinary business in the absence of a statute.

**B. The Legislature Limited Dramshop Liability in Response to *Lopez*, Indicating Legislative Intent to Narrowly Tailor Third-Party Liability for DWI**

**{70}**    In response to *Lopez*, the Legislature enacted Section 41-11-1 the following year. *Trujillo v. Trujillo*, 1986-NMCA-052, ¶ 18, 104 N.M. 379, 721 P.2d 1310, *implicitly overruled on other grounds as recognized in Mendoza v. Tamaya Enters., Inc.*, 2010-NMCA-074, ¶ 20, 148 N.M. 534, 238 P.3d 903. The 1983 version of Section 41-11-1 was titled "Relating to Alcoholic Beverages; Limiting Civil Liability in Sales of Alcoholic Beverages or Serving of Alcoholic Beverages to Guests." *Id.* (quoting 1983 N.M. Laws, ch. 328, § 1). Our courts quickly acknowledged that the Legislature intended Section 41-11-1 to narrow the scope of liability established in *Lopez. See Baxter*, 1988-NMSC-024, ¶ 8 ("The enactment of Section 41-11-1 in 1983 . . . narrowed the liability of tavernkeepers."); *Trujillo*, 1986-NMCA-052, ¶ 21 ("The statute was an obvious response to *Lopez*, . . . . [and w]e would contravene legislative intent were we to interpret the statute as broadening the scope of tavernkeeper's liability."); *Mendoza*, 2010-NMCA-074, ¶ 8 (observing that Section 41-11-1 "limited the scope of dramshop liability").

**{71}** Liability was narrowed in two key areas: social host liability under Section 41-11-1(E) and tavernkeeper liability to patrons under Section 41-11-1(B). *See Delfino*, 2011-NMSC-015, ¶ 32 (stating that social host liability under Section 41-11-1 implies "only a responsibility not to be reckless in providing gratuitous alcohol"); *Sanchez*, 1997-NMCA-068, ¶ 16 (recognizing the higher recklessness standard for patron claims). The recklessness standard presents a "sizeable hurdle[ ]" to recovery and "acts as a safeguard against indiscriminately imposing liability upon a person who gives someone else an alcoholic beverage." *Delfino*, 2011-NMSC-015, ¶ 33-34 (brackets, internal quotation marks, and citation omitted). It also prevents tavernkeepers from being sued by their patrons unless "the tavernkeeper acted particularly improperly." *Sanchez*, 1997-NMCA-068, ¶ 19.

**{72}** These gradations of liability—dependent on context, social relationships, and level of culpability—demonstrate nuanced judgments on the part of the Legislature about the proper scope of third-party liability for DWI. Certainly, it cannot be said that the Legislature imposed blanket liability on anyone who contributes to a tortfeasor's intoxication. On the contrary: the Legislature signaled to us, with the enactment of Section 41-11-1, that we set the wrong public policy in *Lopez* when we adopted a one-size-fits-all simple negligence standard.

**C.    Third-Party Liability for DWI Is Limited to Those Who Provide Intoxicants; It Does Not Extend to Those Who Contribute to the Operability of a Vehicle**

**{73}** The Legislature has apportioned legal responsibility for harms caused by DWI to: (1) the intoxicated driver, and (2) one who supplies alcohol to the intoxicated driver. It has not imposed this responsibility on any other parties. This liability structure is rational. "[O]ur legislature wanted to limit liability for alcohol-related injuries and deaths resulting from the sale or service of alcohol to those who actually exercised some degree of control over the service or consumption *of alcohol.*" *Chavez*, 2007-NMCA-018, ¶ 31 (emphasis added).

**{74}** Although we have recognized liability for those who lend vehicles to intoxicated drivers, neither the Legislature nor our decisional law has imposed liability on those who merely contribute to the operability of a vehicle already in the control of an intoxicated person. I do not view this as an oversight, but as a rational policy choice—particularly given that the Legislature has been actively legislating in the area of DWI for decades. *See id.* ¶ 28 (applying the principle that when legislation governs an area of law but remains silent on a particular subarea, the omission is likely intentional); *Gabaldon*, 1999-NMSC-039, ¶ 27 ("[T]he mere lack of a prohibition [on establishing a duty] does not constitute a mandate to create new duties or to apply old duties in new contexts." (internal quotation marks omitted)).

**{75}** Thus, I conclude that the public policy of New Mexico limits liability for DWI and does not extend that liability to merchants of nonalcoholic goods.

**III. THE DUTY ANNOUNCED IN THE MAJORITY OPINION IS UNCLEAR; BUSINESSES WILL NOT KNOW HOW TO CONFORM THEIR CONDUCT TO THEIR NEW LEGAL OBLIGATIONS**

{76}     Gas stations now have a duty "to refrain from selling gasoline to a driver the vendor knows or has reason to know is intoxicated." Maj. op. ¶ 44. The only guidance the majority provides as to the scope of this new duty is that "[g]iven the opportunity to observe a customer, a gasoline vendor may reasonably be expected to know or have reason to know that a customer is so intoxicated as to pose a danger to the motoring public," maj. op. ¶ 41, and "[i]n fact, the vendor would become aware of the purchaser's intoxication as an incidental by-product of the normal sales routine," maj. op. ¶ 42 (internal quotation marks and citation omitted). This implies that a gas station with "the opportunity to observe" a customer must refuse sale to a customer perceived to be intoxicated and about to drive.

{77}     This duty is unclear in three ways. First, it is unclear what is meant by "opportunity to observe." Second, it is unclear how much investigation will be required. And third, it is unclear who owes this duty.

**A.     It Is Unclear What Is Meant by an "Opportunity to Observe"**

{78}     In this case, Denny entered Defendant's gas station and purchased gasoline from an attendant. However, that type of sale is an outlier. People usually pay for gasoline directly at the pump, without interacting with an attendant. Under the majority's holding, the duty not to sell is triggered by a gas station's "opportunity to observe" a customer's intoxication. It would appear that this duty applies when a gas station has any "opportunity to observe" a customer, whether it be in a face-to-face interaction or through a window or security camera.

{79}     How should a gas station know when not to sell gasoline to a customer purchasing gasoline at a pump? If an attendant actually sees possible signs of intoxication, such as a customer outside fumbling with the pump or swaying, does the attendant have a duty to halt a sale in progress? Or does the attendant have a duty to leave his or her post and investigate the reasons why the customer may be fumbling or swaying? Does a gas station have a duty to hire more employees so that someone can be ready to intervene at the pumps while someone else watches the store?

{80}     Is an opportunity to observe even dependent on actual observation? That is, by virtue of having cameras or windows providing a theoretical "opportunity to observe," does a gas station then have a duty not to sell to intoxicated customers at the pumps even when an attendant does not actually observe signs of intoxication? In turn, could busy gas stations avoid liability by limiting opportunities to observe by, for instance, removing cameras?

{81}     Because the majority does not define "opportunity to observe," litigation is foreseeable in every case where a drunk driver stopped for gas before causing harm, regardless of whether an attendant interacted with the customer. Under the majority's

duty analysis, actual knowledge of intoxication is not required, and actual observation of intoxication is not required either. Under this standard, a gas station will not be able to avoid the cost of frivolous litigation by simply demonstrating that it had no duty.

## B. It Is Unclear How Much Investigation Will Be Required

{82}    A gas station, whose business it is to sell gasoline, is generally under no obligation not to sell that product. Under the majority's new rule, a duty not to sell arises if a gas station knows or has reason to know of two conditions: first, that a customer is intoxicated, and second, that the customer intends to drive. Thus, to know whether gasoline may be sold or must be refused, a gas station must ascertain whether those conditions exist, which may require investigation of either or both conditions. The majority provides no guidance about this investigation.

## 1. Intoxication may require investigation

{83}    The majority posits that a gas station will not need to investigate a customer's intoxication because a person's level of intoxication is apparent to a lay observer, as demonstrated by our acceptance of lay witness testimony to a person's level of intoxication. Maj. op. ¶ 41. However, that we recognize the competency of a lay witness to testify that a particular person was intoxicated on a particular occasion does not mean that every person is equipped to determine any person's level of intoxication on any occasion. Although some intoxicated customers can be correctly identified as intoxicated without any investigation, in other cases (1) intoxicated customers will not be perceived as such, and (2) nonintoxicated customers could be misperceived as such. Under the majority's holding, it is unclear whether or to what extent a gas station must investigate a customer's potential intoxication in these ambiguous cases.

{84}    Intoxicated people may not be perceived as such because different people manifest signs of intoxication differently. Law enforcement officers undergo extensive training on how to ascertain whether a driver is intoxicated, precisely because it is difficult to determine whether a given individual is intoxicated at any given time. *See* National Highway Transportation Safety Administration (NHTSA), *DWI Detection and Standardized Field Sobriety Test (SFST) Instructor Guide*, 4-5 (2018) (NHTSA Manual), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/ sfst_full_instructor_manual_2018.pdf (noting that "NHTSA/IACP strongly believe that conducting live alcohol workshops is the optimal way" of learning to detect the signs of alcohol intoxication in different people) (last visited July 1, 2021). Signs of intoxication are many and varied: bloodshot eyes; soiled clothing; fumbling fingers; bruises, bumps or scratches; unusual actions; slurred speech; unusual odors; and abusive language. *Id.* session 6, at 6, 8, 10. No one sign is dispositive, and there is no hard and fast rule that a certain number taken together are dispositive. As law enforcement training acknowledges, developing "the ability to recognize the sensory evidence of alcohol [intoxication] . . . requires practice." *Id.* session 6, at 12.

{85}    On the other hand, nonintoxicated people may be wrongly perceived as intoxicated. Many medical conditions can mimic drug or alcohol impairment, as can

prescription drug effects. *Id.* session 6, at 19 (noting that physical disabilities, injuries, disease symptoms, and prescription drugs can mimic intoxication). For example, brain tumors, brain damage, some diseases of the inner ear, stroke, diabetes, conjunctivitis, shock, and multiple sclerosis can cause behaviors that appear to be signs of intoxication. *Id.* session 8, at 26; *id.* Introduction to Drugged Driving, at 19. Although law enforcement officers are trained to "be aware of medical conditions having symptoms in common with alcohol influence," lay persons do not receive the same training. *Id.* session 8, at 28.

**{86}** Drugged driving adds to these difficulties. DWI can be committed when a driver is drug-impaired "to a degree that renders the person incapable of safely driving a vehicle." Section 66-8-102(B). It is unrealistic to impose a duty on gas station attendants to determine whether a customer is under the influence of drugs at all, let alone whether the customer's drug impairment will lead to unsafe driving. Different types of drugs cause different signs of intoxication. *See* NHTSA Manual, *supra*, Introduction to Drugged Driving at 5. ("[S]ome drug-impaired drivers may look and act quite a bit like persons who are under the influence of alcohol, but others will look and act very differently from alcohol-impaired drivers."). The majority provides no guidance on how gas stations should know when gasoline must be refused based on a customer's drug impairment, and indeed it would not be feasible to provide such guidance given the difficulties in detecting the influence of drugs and projecting the effects of drugs on a person's driving ability.

**{87}** In sum, "determining whether someone is intoxicated is much more problematic" than the majority rule considers. *Umble v. Sandy McKie & Sons, Inc.*, 690 N.E.2d 157, 159 (Ill. App. Ct. 1998). Intoxication is not always readily apparent and "[a] person may display erratic behavior for a number of reasons other than intoxication." *Id.* Because the majority opinion does not discuss these issues, gas stations will not know how to determine whether they have a duty not to sell to a customer whose behavior may or may not be caused by intoxication.

## 2. Driving may require investigation

**{88}** The majority holds that whether a gasoline customer is a "driver" is merely a question of foreseeability, therefore it is not proper to consider that question under our duty analysis. Maj. op. ¶ 43. I disagree and conclude that (1) in the case of negligent entrustment, foreseeability concerns cannot be divorced from the duty analysis, (2) in the case of negligent entrustment of gasoline, the intended use of gasoline must be determined before a duty not to sell arises, and (3) gas stations will not know how to investigate a customer's intended use of gasoline.

### a. Foreseeability is a necessary part of the duty analysis in negligent entrustment because there is only a duty to refrain from entrusting if harm is foreseeable

**{89}** In the doctrine of negligent entrustment, a duty to refrain from entrustment does not arise unless and until harm is foreseeable from the entrustment. *See, e.g.*,

*McCarson*, 1984-NMCA-129, ¶ 13 (quoting Section 308 of the Restatement (Second) of Torts (1965) and stating, "In other words, it is negligent to make an entrustment that creates an appreciable risk of harm"). That is because there is no general duty to refrain from entrusting one's chattel to another person. To the contrary: people routinely give, sell, or lend items to one another in the normal course of life and business. It is generally beneficial, and not harmful, that property changes hands in this way. The free exchange of goods is one of the basic building blocks of our society—we would live in a different society indeed if the law imposed a general duty to refrain from entrusting chattel.

{90}    Thus, negligent entrustment is an exception to the general no-duty rule with regard to exchanging goods. The negligent entrustment exception is only triggered if certain conditions exist: the entrustor knows or has reason to know that harm is foreseeable from the exchange. *See, e.g., Spencer*, 1985-NMCA-033, ¶ 8 (noting that an entrustor "is not liable for injuries to another simply because he owns the [chattel] and voluntarily loans it to another").

{91}    That negligent entrustment deals with an exception to a no-duty rule distinguishes this tort from the general negligence standard at issue in *Rodriguez*, where we held that duty must be determined based solely on policy considerations rather than foreseeability. 2014-NMSC-014, ¶ 1. In *Rodriguez*, we examined the duty of ordinary care of a landowner to keep premises safe for invitees. *Id.* ¶¶ 2, 5. In that case, as in all ordinary negligence cases, the defendants were seeking to prove they were exempt from the default position of having a duty to exercise ordinary care. In the case of negligent entrustment, the situation is reversed:  the *plaintiff* seeks to prove that the defendant was exempt from the default position of having no duty to refrain from entrusting chattel.[7] In order to demonstrate that the negligent entrustment of chattel exception applies, the plaintiff must show foreseeability of harm before a court can recognize any duty on the part of the defendant to refrain from entrusting chattel. In that way, foreseeability cannot be excised from duty in the context of negligent entrustment.

{92}    Both the majority and Plaintiff implicitly acknowledge that duty in negligent entrustment only arises when there is foreseeable harm. *See, e.g.*, maj. op. ¶ 16 ("[I]nherent in [negligent entrustment of chattel] is the duty to refrain from supplying chattel to a person the supplier *knows or has reason to know is likely to use the chattel in a manner creating unreasonable risk of physical harm*." (emphasis added)); The Restatement (Third) of Torts confirms that when liability is premised on the actions of a third party—as it is in the case of negligent entrustment of chattel—whether a defendant's conduct is negligent "depends on the foreseeable likelihood of the actions of other persons." Restatement (Third) of Torts: Phys. & Emot. Harm § 19 cmt. a (2010); *see also id.* cmt. f (explaining that negligent entrustment of an automobile depends upon the entrustor's ability to "foresee a considerable risk," whereas an entrustor "who merely loans a car to an ordinary friend for the evening is not guilty of negligence in

---

[7]An analogous situation is the "bad Samaritan" who does not come to another's rescue. Because there is generally no duty to rescue, a defendant is not liable for failing to rescue unless the plaintiff affirmatively demonstrates that the defendant was exempt from the no-duty rule. *See* Restatement (Second) of Torts § 314 cmt. a (1965) (listing circumstances that may give rise to a duty to rescue).

entrusting the car, even though there is some abstract possibility that the friend might drive the car negligently or recklessly in the course of the evening").

**{93}** Therefore, foreseeability cannot be removed from the duty analysis in the tort of negligent entrustment. In fact, foreseeability of harm is a necessary precondition of any duty to refrain from entrustment. As applied to this case, without the foreseeable harm of an intoxicated person driving a vehicle and injuring someone, there is no duty not to sell gasoline.

**b.      A duty not to sell gasoline could only arise if the intoxicated customer intends to use the gasoline to drive**

**{94}** Gasoline has many uses. Other than its use in a motor vehicle, it may power a chainsaw, lawnmower, or portable generator, for example. *See, e.g.*, *Tharp v. Monsees*, 327 S.W.2d 889, 897 (Mo. 1959) (identifying various uses of gasoline). The policy against DWI is not furthered by denying gasoline to a person who wishes to do yard maintenance or provide electricity to their house during a power outage. An intoxicated person may engage in those activities without violating the law or public policy. Similarly, there is no policy reason to deny gasoline to an intoxicated passenger. Thus the policy against DWI does not support a categorical denial of all sales of gasoline to intoxicated persons simply by virtue of their intoxication. It is only when the intoxicated person intends to use the gasoline to drive a motor vehicle that the policy against DWI could inform any duty to refuse that sale.

**{95}** Therefore a gas station's duty not to sell gasoline arises only when it knows or should know both that the person is intoxicated and that the person is about to drive. Contrary to the majority's view, the gas station's knowledge that the person is a driver is not a question of breach, but of whether it has a duty at all.

**c.      A gas station will not know how to investigate a customer's intended use of gasoline**

**{96}** No doubt the most common type of retail gasoline sale involves a customer putting gasoline directly into a vehicle's tank. In those types of cases, it is evident that the customer intends to use the gasoline to drive. However, "[n]ot all gasoline sold is pumped into motor vehicle tanks, but gasoline is sold in many containers for many different uses." *Tharp*, 327 S.W.2d at 897. It is those "container" cases where the duty to investigate the intended use of gasoline is the most uncertain.

**{97}** If an intoxicated customer arrives on foot—allowing no direct inference that the person is a driver—and tries to purchase gasoline in a container, does the gas station attendant have a duty to inquire as to the ultimate intended use of the gasoline?[8] Perhaps the customer explains that the gasoline will be used for a lawful purpose, such as powering a chainsaw to cut firewood. Does the attendant then have a duty to determine whether the person is telling the truth? If so, what types of answers can be

---

[8]It is not simply hypothetical that a person might approach a gas station on foot and purchase gasoline in a container. In the case at bar, Denny did just that the first time that he purchased gasoline.

considered reliable? How can an attendant know what proof will be necessary or sufficient to relieve the gas station of liability? A cautious attendant would simply not sell to the intoxicated would-be firewood cutter, even though no public policy exists against such sales.

**{98}**   Similar questions may be presented in situations involving an intoxicated passenger attempting to pay for gasoline. What duty would the attendant have to investigate the intoxicated person's claim that he or she is a passenger? Could the attendant accept at face value the word of the intoxicated passenger? If further investigation is needed, how should that investigation be conducted? What type of proof would be sufficient to relieve the gas station of liability?

**{99}**   The answers to these questions are unexplored by the majority and remain undetermined, leaving gas stations unsure how to proceed when an intoxicated customer who may or may not be a driver wishes to purchase gasoline.

## C.   It Is Unclear Who Owes This Duty

**{100}**  There are two principal causes of DWI: intoxication and a vehicle. But the majority imposes a duty on gas stations because gasoline contributes to a vehicle's operability and thereby is a secondary cause of DWI. *See* maj. op. ¶ 30 ("Gasoline, alcohol, and the vehicle itself are all enabling instrumentalities involved in intoxicated driving."); maj. op.  ¶ 36 ("We see no meaningful difference . . . between a duty not to give an intoxicated person the keys to a vehicle and a duty to refrain from giving an intoxicated person gasoline to drive that vehicle. Both instrumentalities enable driving while intoxicated, which creates an unreasonable risk of harm to the driver and the motoring public."). In essence, the majority equates duty with proximate cause: as long as someone provides an "enabling instrumentality" for DWI, that person can now be held liable under a negligent entrustment theory.

**{101}**  The proximate causes of DWI are legion. For a vehicle to operate, many "enabling instrumentalities" are required: tires, brakes, batteries, starters, and the like. Under the majority's holding, are vendors of those items also liable? Absent a limiting principle, it would appear that they are. Tire repair shops, mechanics, drive-thru oil change and brake services, roadside assistance providers, and auto parts dealers could all face litigation over an intoxicated customer's torts. In the context of electric vehicles, providers of electric charging stations could be in that position as well. All of those businesses provide "enabling instrumentalities" for operable vehicles, which would signal that they now have a duty not to sell to intoxicated drivers.

**{102}**  I cannot conclude that DWI prevention requires a seemingly limitless extension of liability to businesses that help vehicles operate. *See, e.g.*, *Hermosillo*, 2000-NMCA-096, ¶ 17 (refusing "to impose a duty with open-ended time and place limits on anyone who might be able . . . to prevent the driver from getting drunk or from freely driving while in an intoxicated state" (internal quotation marks omitted)); *Herrera*, 2003-NMSC-018, ¶ 23 (cautioning against the "potentially limitless liability arising from mere cause in fact" (internal quotation marks and citation omitted)). As a matter of policy, I believe that

Pep Boys should not have to prepare to defend itself in court for selling a new battery to an intoxicated person, even though a working battery is as much a proximate cause of DWI as gasoline. Yet under the majority's holding, that company cannot be sure of avoiding liability for a customer's tort based on a simple lack of duty.

## IV.  CONCLUSION

**{103}**  The duty the majority announces today extends the reach of negligent entrustment far beyond the bailment context that we have previously recognized and for the first time applies that doctrine to a commercial sale. I do not concur with this sea change in the law because imposing a duty not to sell undermines important public policies. The neutral regulation of sales by the Legislature promotes nondiscriminatory, fair business practices and provides merchants with certainty that they will not be liable for a customer's torts when they sell an ordinary, nondefective product. Our own jurisprudence and the weight of authority of other jurisdictions counsel that negligent entrustment is properly confined to bailments rather than retail sales. Moreover, the duty announced today is unclear in its scope and application. Gas stations and other merchants will not know what business practices they must adopt to protect themselves from liability.

**{104}**  Ultimately, the Legislature should set the parameters of trade. It is the Legislature that is able to fully consider all of the ramifications of restraints on trade and weigh the societal benefits against the costs. In my view, the costs outweigh the benefits of this new, uncertain duty, and I would not impose it.

**{105}**  Therefore, I respectfully dissent.

**BARBARA J. VIGIL, Justice, retired**
**Sitting by designation**